[Crim. No. 34489. Second Dist., Div. Five. Nov. 7, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ALICE HERNANDEZ et al., Defendants and Appellants.

COUNSEL

Lee B. Ackerman and Quin Denvir, State Public Defender, under appointments by the Court of Appeal, and Adrian K. Panton, Deputy State Public Defender, for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Frederick Grab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CARDENAS, J.*—Defendants, Alice Hernandez and Daniel J. Holmes, each appeal from a judgment of conviction of one count of Penal Code section 273a, subdivision (1).

Defendants were charged in count I of the information[1] with a violation of section 273a, subdivision (1) of the Penal Code alleged to have occurred between September 1, 1977, and April 18, 1978. Defendants waived their right to a jury trial and after a court trial on December 14, 1978, each was found guilty as charged. Probation reports were ordered. The probation department recommended that Hernandez be referred to the state prison for a 90-day diagnostic study pursuant to the provisions of Penal Code section 1203.03. After further proceedings

---

*Assigned by the Chairperson of the Judicial Council

[1]We recognize that the allegations refer to the second two portions of the statute which alleged as follows: "That the defendants between September 1, 1977, and April 18, 1978, in the County of Los Angeles did willfully and unlawfully and feloniously, under circumstances and conditions likely to produce great bodily harm and death, cause and permit the person and health of Rebecca Holmes, a child, to be injured and said child to be placed in such a situation that said child's person and health was endangered, and defendants having the care and custody of said child."

on January 26, 1979, probation was denied as to Hernandez and she was sentenced to the state prison for the upper term of 3 years with credit for time served of 28 days. The court at that same time rejected defendant Hernandez' request for an updated psychological report prior to sentencing. Defendant Holmes was placed on three years' probation on condition that he serve the first year in the county jail.

*Facts*

Alice Hernandez and Daniel Holmes lived together as husband and wife for 10 to 12 years. They have two children, Daniel Holmes, Jr. (10 years old), and Rebecca Holmes (born Sept. 22, 1969). Also living in their home were Alice Salazar, Hernandez' 14-year-old daughter, and Dolores Osio, a niece. On April 14, 1978, Osio was home alone and heard noises coming from the back bedroom. Investigating the sound, she opened the closet door in Hernandez' bedroom and found Rebecca seated inside in a crib. Osio had resided in the Holmes-Hernandez residence approximately three weeks prior to the discovery of Rebecca. The child's clothing was dirty and the closet smelled strongly of urine and the walls were brown. Osio had not seen Rebecca since she was less than a year old. When Rebecca did not respond to Osio's greetings, Osio left the house.

Some days later acting on information supplied by Dolores Osio, Sheriff's Officers Rodina and Travis returned to the house and found Rebecca seated on a vinyl cot placed in front of the closet. Her clothing was soaked with urine and her diapers were full of fecal matter. The officers investigated the closet and reported that it smelled strongly of urine and that the walls were covered with human fecal matter. The officers' conclusion was later confirmed by expert testimony and the admission of Mrs. Hernandez. By contrast, the rest of the home was clean and neat.

Dr. Widelitz examined Rebecca the next day. Although Rebecca was eight and a half years old at the time, he found her weight and height to be approximately normal for a two-and-a-half-year-old child. She weighed 24 pounds. Both knees and hips were dislocated and her knees were hyperextended. She was unable to walk or stand. Her teeth were grey and covered with a large amount of plaque. She was not toilet trained and had severe diaper rash which excoriated the entire diaper area. Her vocabulary was limited to 25 words. Dr. Widelitz concluded

that Rebecca was grossly retarded. Dr. Widelitz last examined Rebecca in November 1978. At the time of trial, Rebecca had been living in a foster home for six months. Her diaper rash was completely healed and she was then toilet trained. While her hips and knees were still dislocated, she was able to stand and walk by holding on to furniture and she had achieved substantial height and weight gains. While he did not diagnose Rebecca as a psychosocial dwarf, he did state that her short stature was partially attributable to her environment. Her vocabulary had increased and she verbalized spontaneously.

Prior to her examination by Dr. Widelitz, Rebecca had not seen a physician since birth. Defendant stated she was delivered by Caesarean section at St. Francis Hospital in Lynwood, after a five-and-a-half-month pregnancy. Hospital records indicate that Rebecca's apgar score (used to determine a child's mental and neurological normalcy) at birth was somewhat low. Hernandez claims that she was told by a staff physician that Rebecca would be retarded and a dwarf. Defendant Holmes stated that Hernandez' attending physician told him that Rebecca would be seven or eight years behind other children. Defendants discussed but decided against giving Rebecca up for adoption. Hernandez never took Rebecca back to a doctor for even routine checkups and gave as a reason that she believed retardation could not be treated, the child was never physically sick, and she was afraid that if she took Rebecca to a doctor, the child would be institutionalized.

At least from late 1977 to April 1978, the only people to see Rebecca were her parents and brother and sister. Officer Rodina testified that Hernandez admitted to keeping the child in a closet for six months. How long she had been partially or totally isolated prior to that time is unknown. Hernandez' brother, Aurelio (Billy), and sister, Christine, lived in a small house directly behind hers. Although Christine was in the defendants' residence once or twice every day, she told Officer Rodina she had not seen Rebecca in over six years. She had accepted Hernandez' explanation that the child had been given away to Holmes' sister. Billy stated that he had seen defendants and the two children at family outings, but never with Rebecca. He had also seen the entire family depart together leaving no one home and leaving Rebecca apparently unattended. Dolores Osio lived in the defendants' home for three weeks and was totally unaware of Rebecca's presence. A neighbor testified he had never seen Rebecca until the police brought her out of the home. Alice Salazar and Danny, Jr., told Officer Rodina that Rebecca was kept in a closet and that they were not supposed to talk about it.

However, at the trial they described a very different family environment. Contrary to being isolated, Rebecca was depicted as very much a part of the family gathering and family life. Holmes testified that he went along with the treatment of the child because of his love for Hernandez and the other children. He claimed that he was unaware that Rebecca was confined in a closet or kept from seeing anyone else in the outside world. Defendants denied isolating, confining, or otherwise secreting Rebecca. However, despite defendants' denials the trial court found that they physically isolated, confined, and neglected Rebecca for a prolonged period of time, to her detriment.

## Discussion

Defendants each contend on appeal that the evidence adduced at the trial was insufficient to establish the requisite degree of knowledge, and therefore, the requisite mental state to support a conviction for child abuse in violation of Penal Code section 273a, subdivision (1).

Defendant Hernandez in addition argues the following on appeal. (1) That the evidence is insufficient to support the felony conviction and at best only supports a conviction under section 273a, subdivision (2) of the Penal Code, a misdemeanor. (2) That the use of "unproven charges" without prior notice at the probation and sentence hearing denied her due process. (3) That the trial court abused its discretion in failing to follow the recommendation of the probation department. (4) That the use of "unproven charges" to aggravate the sentence without prior notice was error. (5) That the trial court's failure to require an updated psychiatric evaluation was error.

## I

The record reflects that the trial court totally disbelieved Hernandez and to a lesser degree,. Holmes' credibility was found lacking as well. The trial court clearly chose to believe the testimony of relatives, neighbors, medical experts, investigative witnesses, and the physical evidence in arriving at its verdict. The evidence amply demonstrates that defendants failed to provide for the needs of Rebecca and that the same persisted for years; such that intent to harm Rebecca could be inferred by the court. (*In re Maria R.* (1976) 64 Cal.App.3d 731, 735, 736 [155 Cal.Rptr. 2].) The record is replete with evidence that Rebecca was hidden and secreted since she was six months old. During such time, she was neglected and deprived of medical, emotional, and physical care to

her detriment. Further there is evidence that Rebecca was kept in a closet for at least a six months' period.

Section 273a, subdivision (1) of the Penal Code requires that "defendant's conduct must amount to a reckless, gross or culpable departure from the ordinary standard of due care; it must be such a departure from what would be conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for human life...mere inattention or mistake in judgment is insufficient to support a criminal conviction." (*People* v. *Peabody* (1975) 46 Cal.App.3d 43, 48-49 [119 Cal.Rptr. 780].)

Defendants' argument that their conduct, at worst, constituted a mistake in judgment, lack of foresight or irresponsibility is not well taken. We are persuaded that the record amply supports the conviction of each defendant. Substantial evidence of the requisite intent, to support, a felony conviction pursuant to Penal Code section 273a, subdivision (1) is found in the record. Defendants failed to meet their burden on appeal.

## II

Defendant Hernandez's argument that the record does not support a felony conviction pursuant to the Penal Code section 273a, subdivision (1) for the reason that the evidence does not demonstrate she "acted under circumstances or conditions likely to produce great bodily harm or death" is not well taken.

Penal Code section 273a does not focus upon actual injury produced by abusive actions but rather upon whether or not the attendant circumstances make great bodily injury likely. Occurrence of great bodily injury is not an element of the offense.

"The statute is intended to protect a child from an abusive situation in which the probability of serious injury is great." (*People* v. *Jaramillo* (1979) 98 Cal.App.3d 830, 835 [159 Cal.Rptr. 771].)

From the record, it is apparent that the court did properly conclude that defendants' prolonged confinement and isolation of Rebecca, without proper emotional or medical attention under unsanitary conditions, constituted "conditions likely to produce great bodily harm." There was substantial evidence to conclude that the environmental situation in fact

played a significant role in her growth retardation, developmental delay, and inability to walk.

## III

A consideration of Hernandez' other points on appeal requires a recitation of what occurred at the probation and sentence proceedings on January 26, 1979.

Over objection, the prosecution called Marlene Lopes, a welfare investigator for the Department of Public Social Service, who was the investigator in a pending welfare fraud case against Hernandez. The probation report indicated that defendants were making restitution to Los Angeles County at that time. Lopes testified with respect to Hernandez' receipt of welfare payments for the benefit of Rebecca for the years 1976, 1977, and 1978. Lopes testified that Hernandez had on several occasions both stated and signed WR-2 forms of the department to the effect that Holmes was "absent" from the home thus making her eligible to receive benefits for Rebecca. This contradicted her testimony, at the trial, that Holmes was always at home.

Next the prosecution called Miriam Travis, a sergeant in the sheriff's department, who over objection, was permitted to testify that on April 18, 1978, she confronted defendant Holmes with respect to Rebecca's condition and that he responded with the following: "All right. He said that it was his wife's doings. That she never wanted Rebecca. That she tried to lose Rebecca while she was carrying her during her pregnancy. That she didn't give a shit about Rebecca. He went on to state that she blamed the pill for Rebecca's defects, and blamed Rebecca for the scars or scar left by the Caesarean section. And that she never—she again stated she never wanted Rebecca. I believe, also, that she stated that she was ashamed of Rebecca. He stated that they had many fights, and that he went along with her just to keep the family together. At one time he stated many times he would take Rebecca out into the living room, Alice would become so upset and take Rebecca away from him and take her back into the bedroom. And we asked him, then, why he went along with this, and he stated that she would not talk to him for a couple of weeks and would cut him off. sexually." This testimony had *not* been allowed at the trial of the case in chief.

The defense called Deputy Probation Officer James Vaughn who was asked general questions with respect to suitable arrangements for a di-

agnostic study which was recommended. The prosecution, believing that the probation officer had been deceived by Hernandez, and in an attempt to discredit the report's recommendation, cross-examined the witness with respect to the following: whether defendant would be a good candidate for probation, the purpose of a 1203.03 recommendation, factors in mitigation and aggravation, whether Hernandez was credible, whether knowledge of the pending welfare case would alter in any way his opinion, the probation officer's omission of material facts from the report, failure to include medical evidence in the report, and evidence of Rebecca's confinement.

Hernandez testified to the existence and location of the Caesarean scar and that it did not interfere with the wearing of her bikini suit. She was not asked nor did she deny signing the WR-2 cards or making the statements to Lopes.

We now consider Hernandez' claims of prejudicial error.

■ Hernandez was not prejudiced by the introduction of the testimony of Marlene Lopes. We note that she has referred to the testimony of Lopes as "unproven charges." The record discloses that Lopes' testimony was limited to statements made to her by Hernandez with respect to Holmes' presence or absence from the home in the years 1976, 1977, and 1978, and the WR-2 forms signed by Hernandez indicating Holmes was "absent" from the home. The record discloses further that the court was not mistaken and considered the evidence presented solely for the purpose of determining credibility and the suitability of Hernandez for probation as opposed to a state prison sentence. "[P]roper consideration of a defendant's flagrant untruthfulness under oath as one element in determining the defendant's amenability to rehabilitation is not violative of due process under the California Constitution." (*In re Perez* (1978) 84 Cal.App.3d 168, 172 [148 Cal.Rptr. 302].)

Hernandez' counsel was advised that the prosecution would present evidence in aggravation on January 15, 1979, and was afforded the opportunity to cross-examine Lopes and to inquire with respect to defendant's signature on the WR-2 forms and her statements. Absent an offer of proof by counsel with respect to what it proposed to disprove or prove if given sufficient time, we cannot say that Hernandez was denied due process. We conclude that the trial court's limited use of Lopes' testimony was within its discretionary power and not error.

## IV

■ The court did not abuse its discretion in failing to follow the probation officer's recommendation.

The trial court has broad discretion to grant or deny probation, except where otherwise limited by statute, and a decision denying probation will be reversed only upon a clear showing of abuse and that the court acted in a capricious or arbitrary manner. (*People* v. *Edwards* (1976) 18 Cal.3d 796 [135 Cal.Rptr. 411, 557 P.2d 995]; *People* v. *Wade* (1959) 53 Cal.2d 322 [1 Cal.Rptr. 683, 348 P.2d 116].) The court used and considered the probation report and referred to it during the sentence hearing. Upon a full review of the record, we are satisfied that the court did not abuse its discretion in rejecting the recommendation of the probation department.

## V

Hernandez' contention that the trial court permitted evidence of her contradictory statements to Lopes and testimony of Travis to be used to *aggravate* her sentence is without merit.

Section 1170, subdivision (a)(2) of the Penal Code requires the court to apply the judicial council's sentencing rules (Cal. Rules of Court, rule 439(c)) and to state the reasons for its sentence choice on the record at the time of sentencing. (Pen. Code, § 1170, subds. (b), (c).) The court did state, for the record, its reasons for the sentence choice, and further what it considered an aggravation of the sentence. Defendant *assumed* that the court did in fact grant the prosecution's motion to consider the testimony of Lopes and Travis for the purposes of aggravation. The record does not disclose that the trial court granted the prosecution's motion. Defendant's motion to strike the district attorney's offer was likewise not ruled upon.

Our review of the record discloses that the court stated *its* reasons for denying probation and for imposing sentence at considerable length. There is no hint, indication or mention of the objected-to evidence in the court's pronouncement of sentence.

Defendant's argument that the court improperly considered the objected-to evidence in *aggravation* of the sentence imposed finds no support in the record.

It is noted that the comments of the trial court with respect to aggravation are also reflected in the probation officer's report under circumstances in aggravation.

Defendant contends that she was denied due process by reason of the prosecution's failure to give proper notice of the presentation of aggravating circumstances. The record reflects that due notice was given to the defendant as prescribed in Penal Code section 1170, subdivision (b). Further, the aggravating circumstances were reflected in the probation report, which the defendant received before the hearing. We note that defendant did not offer any evidence in mitigation of the sentence.

■ Defendant's contention that a statement in aggravation is a necessary precondition to the trial court's considering an upper term is without merit. The statements in mitigation and aggravation are intended to permit the parties to present further evidence if they so choose. (*People* v. *Pinon* (1979) 96 Cal.App.3d 904, 911 [158 Cal.Rptr. 425].)

## VI

■ Failure to obtain an updated psychological evaluation prior to imposing sentence was not prejudicial error.

The probation department recommended a referral to the Department of Corrections for a diagnostic study to further assist the court in its judgment. (Pen. Code, § 1203.03.) Defendant urges on appeal that the court erred in rejecting her request for an updated report from Dr. Winifred Myers prior to sentence. Defendant, for the first time on appeal, refers to Penal Code section 1203h[2] in support of her contention that the court was required to obtain a current psychological report prior to sentencing.

A literal reading of section 1203h in conjunction with Penal Code section 1203 is confusing and leads to an illogical result. Section 1203,

---

[2]If the trial court initiates an investigation pursuant to subdivision (a) or (d) of section 1203 and the convicted person was convicted of violating any section of this code in which a minor is a victim of an act of abuse or neglect, then the investigation shall include a psychological evaluation to determine the extent of counseling necessary for successful rehabilitation and which may be mandated by the court during the term of probation. Such evaluation may be performed by psychiatrists, psychologists, or licensed clinical social workers. The result of the examination shall be included in the probation officer's report to the court.

subdivision (a) refers to a definition of probation and section 1203, subdivision (d) refers to persons convicted of misdemeanors.

A review of statutory amendments reveals a legislative intent that the provisions of section 1203h apply to felonies and misdemeanors. ■ "Where the legislative intent is clear, penal statutes must be construed reasonably to effectuate such intent. They should not be read literally where to do so would lead to absurd consequences." (*Isaac* v. *Superior Court* (1978) 79 Cal.App.3d 260, 264 [146 Cal.Rptr. 396].) "If the intent of the Legislature is clearly ascertainable, words inadvertently omitted from a statute may be supplied in the process of construction in order to effectuate the legislative intent." (*People* v. *Medina* (1971) 15 Cal.App.3d 845, 848 [93 Cal.Rptr. 560].)

A review of legislative amendments discloses the following: Chapter 1130 (Sept. 1977) added sections 1203h and 3001 to the Penal Code in order to carry out the legislative intent with respect to persons convicted of child abuse. Chapter 1174 (1979) amended Penal Code section 1203 to include an express definition of probation (§ 1203, subd. (a)).

Section 1203h was amended at the same time. We note that the 1979 amendment substituted "subdivision (a) or (d)" for "subdivision (a) or (c)." Prior to the 1979 amendment section 1203, subdivision (a) referred to persons convicted of felonies and section 1203, subdivision (c) referred to persons convicted of misdemeanors. Currently, section 1203, subdivision (b) refers to persons convicted of felonies and section 1203, subdivision (d) refers to persons convicted of misdemeanors.

It is apparent to us that the addition of the definition section 1203 subdivision (a) created confusion with respect to the subdivisions dealing with felonies and misdemeanors. This legislative inadvertence can be easily corrected, consistent with legislative intent, by reading section 1203h as referring to "(b) or (d)" rather than "(a) or (c)."

■ We hold that section 1203h applies equally to felony and misdemeanor convictions of an abuse or neglect of a minor victim. The court shall, with respect to this crime, request and include a psychological evaluation in a probation report whenever it initiates an investigation pursuant to subdivisions (b) or (d) of Penal Code section 1203.

■ Under the facts of this case, we conclude that the court erred in denying defendant's request for an updated psychological report. However, we conclude that this error was not prejudicial.

The court had a prior report that it considered and could have referred Hernandez to the Department of Corrections for a diagnostic study, pursuant to Penal Code section 1203.03, as was recommended. The court firmly rejected the recommendation and expressed its purpose in imposing a state prison sentence. We are convinced that an additional psychological evaluation would not have altered the court's decision.

The judgments are affirmed.

Kaus, P. J., and Hastings, J., concurred.