[No. F013734. Fifth Dist. Sept. 30, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES LOWELL LEE et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the Statement of Facts and parts II through VIII.

**COUNSEL**

Handy Horiye, under appointment by the Court of Appeal, Kindel & Anderson, Godfrey Isaac and Jon L. Rewinski for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edgar A. Kerry and Louis M. Vasquez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HARRIS, J.—**

### STATEMENT OF THE CASE

On May 2, 1989, an information was filed in Kern County Superior Court charging appellants James and Tonette Lee with count I, murder in the first degree (Pen. Code, § 187), and count II, child endangerment (Pen. Code, § 273a, subd. (1)).

On May 3, 1989, appellants were arraigned and pleaded not guilty. On June 20, 1989, appellants' motion to set aside the information was denied, but the court struck the first degree murder allegation.

On February 6, 1990, appellants' jury trial began. On February 20, 1990, the jury found appellants guilty of second degree murder and child endangerment.

On March 19, 1990, Tonette Lee was sentenced to 15 years to life on count I, and 6 years on count II, with the term for count II stayed pursuant to Penal Code section 654. On April 16, 1990, Mr. Lee was also sentenced to 15 years to life on count I, with the 6-year term for count II stayed pursuant to section 654.

On March 21, 1990, Tonette Lee filed a timely notice of appeal. On April 20, 1990, Mr. Lee also filed a notice of appeal.

## SUMMARY OF FACTS

The infant victim, Janelle, was born October 1, 1988, the third child of appellants' marriage. She was approximately one month premature. Her birth weight was five pounds six and one-half ounces. She and her mother remained in the hospital for five days. When released Janelle was described as "healthy" and in "good physical condition." On December 8, 1988, at the age of two months seven days, Janelle died. At death her body was extremely emaciated and dehydrated. Her weight was four pounds. The autopsy pathologist determined the underlying cause of death to be "severe malnutrition or undernutrition." The manner of death, defined by the autopsy pathologist as "how it happened, not what happened," was disputed. Prosecution medical experts eliminated as an explanation for the undernutrition any physical abuse or blunt physical trauma to the body as well as any disease or congenital abnormalities, but testified that the victim's condition was not consistent with having been regularly fed. One defense expert concluded that neither the cause nor manner of death could be determined, considered sudden infant death syndrome or malabsorption "possible," but conceded that starvation was one possible explanation for Janelle's condition which was consistent with not being given proper nourishment. Another defense expert concluded that while the manner of death could not be determined, the cause of death was undernutrition. Appellants were each convicted of second degree murder and child endangerment.

## STATEMENT OF FACTS*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISCUSSION

### I.

### THE USE OF THE SECOND DEGREE FELONY-MURDER RULE WITH CHILD ENDANGERMENT AS THE UNDERLYING FELONY IS ERRONEOUS BECAUSE THAT OFFENSE IS NOT "INHERENTLY DANGEROUS TO LIFE."

Appellants were charged with second degree murder and felony child endangerment. In the murder charge, the prosecution sought a conviction on

---

*See footnote, *ante,* page 1214.

either of two theories: implied malice or felony murder. The felony-murder allegation was based on the underlying felony of child endangerment (Pen. Code, § 273a, subd. (1)). The jury was instructed that if it found the Lees guilty of the underlying felony, such a finding served as the basis for a second degree murder conviction. While the Lees were ultimately convicted of second degree murder, the jury did not make any special findings as to whether that conviction was based on felony murder or implied malice.

Prior to trial, the defense argued that the prosecution could not rely on child endangerment as the underlying felony for second degree felony murder because it was not inherently dangerous to human life under the guidelines of *People* v. *Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894] and *People* v. *Patterson* (1989) 49 Cal.3d 615 [262 Cal.Rptr. 195, 778 P.2d 549]. The defense also noted that the Third Appellate District in *People* v. *Caffero* (1989) 207 Cal.App.3d 678 [255 Cal.Rptr. 22] expressly rejected the use of child endangerment with the felony-murder rule. The prosecution relied on the contrary opinion in *People* v. *Shockley* (1978) 79 Cal.App.3d 669 [145 Cal.Rptr. 200]. The trial court noted that the Supreme Court had only partially resolved the issue in *People* v. *Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886]. The trial court ultimately rejected the reasoning in *Caffero* and allowed the prosecution to rely on child endangerment and the felony-murder rule:

"It seems to me self-evident that any time one perpetrates on a child an activity which is likely to produce great bodily harm, that could also result in death, and it seems to me under the analysis of Patterson, even using the standard of a high probability of death, that you can peg a felony murder on a 273(a) charge."

Appellants were convicted of both second degree murder and felony child endangerment. ■ On appeal, they argue that the court improperly allowed the prosecution to proceed on a felony-murder theory. Their contention is based on two arguments: (1) child endangerment is not an "inherently dangerous felony" pursuant to *Burroughs* and *Patterson*, and (2) child endangerment is integral to and merges into the homicide pursuant to *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] and *Smith*. We will hold that Penal Code section 273a, subdivision (1), felony child endangerment, does not define an offense "inherently dangerous to life" and for such reason is not a qualifying felony for application of the felony-murder rule. We thus find it unnecessary to reach appellants' *Ireland* argument that child endangerment is integral to the homicide. Our analysis requires we first review Penal Code section 273a, subdivision (1) and the principles behind the felony-murder rule.

*Felony child endangerment.*

■ Penal Code section 273a punishes the acts generally classified as child abuse, and may be violated either by a single act or a repetitive, continuous course of conduct. (*People* v. *Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299]; *People* v. *Sheffield* (1985) 168 Cal.App.3d 158, 167 [214 Cal.Rptr. 40]; *People* v. *Odom* (1991) 226 Cal.App.3d 1028, 1033 [277 Cal.Rptr. 265].) Penal Code section 273a, subdivision (1) provides for felony punishment under the following circumstances:

"(1) Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one year, or in the state prison for 2, 4, or 6 years." Misdemeanor status is given to the commission of the same acts "under circumstances or conditions *other* than those likely to produce great bodily harm or death." (Pen. Code, § 273a, subd. (2), italics added.) Section 273a does not focus upon actual injury produced by abusive actions but "rather upon whether or not the attendant circumstances make great bodily injury likely. Occurrence of great bodily injury is not an element of the offense." (*People* v. *Hernandez* (1980) 111 Cal.App.3d 888, 895 [168 Cal.Rptr. 898].) It is the likelihood of foreseeable injury, rather than whether such injury in fact occurs, that is relevant. (*People* v. *Superior Court* (*Duval*) (1988) 198 Cal.App.3d 1121, 1135 [244 Cal.Rptr. 522].) The statute is intended to protect children from situations in which the "probability of serious injury is great." (*People* v. *Jaramillo* (1979) 98 Cal.App.3d 830, 835 [159 Cal.Rptr. 771].)

The language of the statute sets out several ways in which it can be violated: by a person who (1) willfully and directly inflicts "unjustifiable physical pain or mental suffering" upon the child, (2) willfully "permits" the infliction of such pain or suffering or injury to the child's "person or health," or (3) having the care or custody of the child, willfully places or permits the child to be placed " 'in such situation that its person or health is endangered. . . .' " (*People* v. *Vargas* (1988) 204 Cal.App.3d 1455, 1465 [251 Cal.Rptr. 904]; 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Crimes Against Decency and Morals § 840, p. 956.) Felony child abuse "can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect. *Two threshold considerations, however, govern all types of conduct prohibited by this law*: first, the conduct must be willful; *second,*

it must be committed 'under circumstances or conditions likely to produce great bodily harm or death.' (§ 273a, subd. (1).) Absent either of these elements, there can be no violation of the statute." (*People v. Smith, supra,* 35 Cal.3d 798, 806, italics added.)

■ Section 273a, subdivision (1) requires that "defendant's conduct must amount to a reckless, gross, or culpable departure from the ordinary standard of due care; it must be such a departure from what would be the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for human life. . . . [¶] [M]ere inattention or mistake in judgment is insufficient to support a criminal conviction." (*People v. Peabody* (1975) 46 Cal.App.3d 43, 48-49 [119 Cal.Rptr. 780]; *People v. Hernandez, supra,* 111 Cal.App.3d 888, 895.) The term "willful" does not require intent to injure the child, but " 'implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage.' " (*People v. Atkins* (1975) 53 Cal.App.3d 348, 358 [125 Cal.Rptr. 855]; *People v. Pointer* (1984) 151 Cal.App.3d 1128, 1134 [199 Cal.Rptr. 357].)

*The felony-murder rule.*

■ "When an individual causes the death of another in furtherance of the perpetration of a felony, the resulting offense may be felony murder." (*People v. Burroughs, supra,* 35 Cal.3d 824, 829.) There is no precise statutory definition for the second degree felony-murder rule, and the doctrine is the "creature of judicial invention." (*Id.* at p. 829, fn. 3.) "A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder. [Citations.]" (*People v. Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892]; *People v. Patterson, supra,* 49 Cal.3d 615, 621.)

The underlying purpose of the felony-murder rule is to encourage felons to commit their offenses without perpetrating unnecessary violence which might result in a homicide. (*People v. Burroughs, supra,* 35 Cal.3d at p. 833.) The Supreme Court has criticized the felony murder rule as "in disfavor" and a "highly artificial concept" which "deserves no extension beyond its required application." (*People v. Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]; *People v. Dillon* (1983) 34 Cal.3d 441, 462-463 [194 Cal.Rptr. 390, 668 P.2d 697]; *People v. Burroughs, supra,* 35 Cal.3d at p. 829.) This criticism has been based on the "view of many legal scholars that the doctrine incorporates an artificial concept of strict criminal liability that 'erodes the relationship between criminal liability and moral

culpability.' [Citations.]" (*People* v. *Patterson, supra,* 49 Cal.3d 615, 621.) Despite this criticism, the court declined the opportunity to overrule the doctrine in *Patterson* because the Legislature "has taken no action to alter this judicially created rule, and has declined our more recent suggestion in [*Dillon*]" that it reconsider first and second degree felony murder. (*Ibid.*) *Patterson* also rejected the prosecution's invitation to "significantly expand" the scope of the doctrine, and reiterated that the doctrine "'deserves no extension beyond its required application.'" (*Id.* at p. 622.)

The felony-murder rule generally acts as a substitute for the mental state ordinarily required for the offense of murder. (*People* v. *Patterson, supra,* 49 Cal.3d at p. 626.)

"Under well-settled principles of criminal liability a person who kills—whether or not he is engaged in an independent felony at the time—is guilty of murder *if he acts with malice aforethought.* The felony-murder doctrine, whose ostensible purpose is to deter those engaged in felonies from killing negligently or accidentally, operates to posit the existence of that crucial mental state—and thereby to render irrelevant evidence of actual malice or the lack thereof—when the killer is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it." (*People* v. *Satchell* (1971) 6 Cal.3d 28, 43 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People* v. *Patterson, supra,* 49 Cal.3d at p. 626.) Implied malice has both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." (*People* v. *Phillips, supra,* 64 Cal.2d at p. 587; *People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) The mental component requires the defendant "'know that his conduct endangers the life of another and . . . acts with a conscious disregard for life.'" (*People* v. *Phillips, supra,* 64 Cal.2d at p. 587; *People* v. *Watson, supra,* at p. 300.) The second degree felony-murder rule eliminates the need for the prosecution to establish the mental component. The physical requirement remains, however, and it must be shown that the defendant committed a felony inherently dangerous to life. (*People* v. *Patterson, supra,* 49 Cal.3d at p. 626.)

With these principles in mind, we address appellants' argument that child endangerment is not a felony "inherently dangerous to life."

*Inherently dangerous to life.*

■ "[O]nly such felonies as are in themselves 'inherently dangerous to human life' can support the application of the felony-murder rule." (*People* v. *Phillips, supra,* 64 Cal.2d 574, 582.)

■ The Supreme Court has set out several principles to determine whether a felony is "inherently dangerous to life" and thus valid to use with the second degree felony-murder rule. In assessing whether the felony is inherently dangerous, "we look to the elements of the felony in the abstract, not the particular 'facts' of the case." (*People* v. *Williams* (1965) 63 Cal.2d 452, 458, fn. 5 [47 Cal.Rptr. 7, 406 P.2d 647]; *People* v. *Burroughs, supra,* 35 Cal.3d at pp. 829-830; *People* v. *Patterson, supra,* 49 Cal.3d at p. 622.) The felony offense must be examined based on a bipartite standard: (1) the court must examine the "primary element" of the offense at issue and determine whether it involves the requisite danger to life; and (2) it must then look to the "factors elevating the offense to a felony," to determine whether the felony, taken in the abstract, is inherently dangerous to human life. (*People* v. *Henderson* (1977) 19 Cal.3d 86, 93, 94 [137 Cal.Rptr. 1, 560 P.2d 1180]; *People* v. *Burroughs, supra,* 35 Cal.3d at p. 830.)

In *People* v. *Mattison* (1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193], the court held that poisoning food, drink or medicine with intent to injure was inherently dangerous. (See *People* v. *Burroughs, supra,* 35 Cal.3d at pp. 832-833.) In *People* v. *Nichols* (1970) 3 Cal.3d 150, 163 [89 Cal.Rptr. 721, 474 P.2d 673], the court held that the willful and malicious burning of an automobile (located in a garage beneath an occupied home) was inherently dangerous. Simple kidnapping has also been held inherently dangerous in *People* v. *Pearch* (1991) 229 Cal.App.3d 1282, 1299 [280 Cal.Rptr. 584]. In contrast, the underlying felonies of false imprisonment (*People* v. *Henderson, supra,* 19 Cal.3d 86), possession of a concealable firearm by an ex-felon (*People* v. *Satchell, supra,* 6 Cal.3d 28), and escape from a city or county penal facility (*People* v. *Lopez* (1971) 6 Cal.3d 45 [98 Cal.Rptr. 44, 489 P.2d 1372]) have been held not inherently dangerous to support a second degree felony-murder conviction.

In *People* v. *Burroughs, supra,* 35 Cal.3d 824, defendant challenged his second degree murder conviction by arguing that the felonious unlicensed practice of medicine was not an inherently dangerous felony. The court analyzed Business and Professions Code section 2053, felony practicing medicine without a license, which states:

"Any person who willfully, *under circumstances or conditions which cause or create a risk of great bodily harm, serious physical or mental illness, or death,* practices or attempts to practice, or advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked or suspended [*sic*] certificate as provided in this chapter, or

without being authorized to perform such act pursuant to a certificate obtained in accordance with some other provision of law, is punishable by imprisonment in the county jail for not exceeding one year or in the state prison." (Italics added.)

The court analyzed the statute in the abstract, applied the bipartite standard of *Henderson,* and determined that the primary element of the offense was the medical treatment of the sick and afflicted without a license. "One can certainly conceive of treatment of the sick or afflicted which has quite innocuous results—the affliction at stake could be a common cold, or a sprained finger, and the form of treatment an admonition to rest in bed and drink fluids or the application of ice to mild swelling. Thus, we do not find inherent dangerousness at this stage of our investigation." (*People* v. *Burroughs, supra,* 35 Cal.3d at p. 830.)

The court next considered the factors which elevated the unlicensed practice of medicine to a felony: "circumstances or conditions which cause or create a risk of great bodily harm, serious physical or mental illness, or death." The court focused on the Legislature's reference to "death" as a separate risk and in the disjunctive, which "strongly" suggested that the Legislature "perceived that one may violate the proscription against the felonious practice of medicine without a license and yet not necessarily endanger human life." (35 Cal.3d at p. 830.) The reference to "great bodily harm" was similar to "serious bodily injury" as defined in Penal Code section 243:

" '[A] serious impairment of physical condition, including, but not limited to the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement.' " (35 Cal.3d at p. 831.) This definition could include a broken arm or leg. "While painful and debilitating, such bone fractures clearly do not, by their nature, jeopardize the life of the victim." (35 Cal.3d at p. 831.) In addition, the "risk of great bodily injury" was equivalent to the definition in Penal Code section 12022.7 of "significant or substantial physical injury," which has been interpreted to include a broken jaw or a broken hand. (35 Cal.3d at p. 831.) "Thus, we must conclude that the risk of great bodily harm under section 2053 is likewise not inherently dangerous to human life." (*Ibid.*)

*Burroughs* concluded that the risks set forth in the offense of felonious practice of medicine without a license were not so critical as to render its commission inherently dangerous to human life for the purposes of second degree felony murder:

"Indeed, were we to interpret either the risk of great bodily harm or serious mental illness as being synonymous with the risk of death for purposes of the felony-murder rule, we would be according those terms a more restrictive meaning than that which the Legislature obviously meant them to have in the definition of the felony itself. Such a reading would require that an unlicensed practitioner of medicine actually perform treatment under circumstances or conditions which necessarily place the very life of the patient in jeopardy before such a practitioner could be susceptible to a conviction for *felonious* unlicensed practice. We possess grave doubts that the Legislature intended such a result." (35 Cal.3d at p. 832.)

The *Burroughs* analysis was applied to felony child endangerment in *People v. Caffero, supra*, 207 Cal.App.3d 678. The Cafferos' daughter was born prematurely and remained in the hospital for five days until being released to her parents. Two weeks later, the mother became concerned about the infant's health because she was blinking and jerking. The mother called the hospital and was advised to call her own physician or bring the child to the emergency room. Mrs. Caffero decided to wait one day to consult with her mother-in-law. The mother-in-law thought the baby suffered from colic and a diaper rash. The next day, the Cafferos brought the infant to the emergency room, and the triage nurse observed that the baby had a normal temperature and was " 'non-urgent.' " A few hours later, the nurse realized the baby was pale and had sores on her genitals. A doctor was summoned but the baby's condition rapidly deteriorated and her temperature and blood pressure became extremely low. She died later that day of an overwhelming bacterial infection. (*Id.* at p. 681.) Four doctors agreed that the infection had been introduced into her bloodstream through a perianal sore and the lack of proper hygiene. The sores should have taken several days to develop and break the skin if diapers were not regularly changed. The doctors also agreed that once the particular infection is introduced into the bloodstream, it can overwhelm the entire system within days. There was no evidence that the infant was starving or malnourished. (*Id.* at p. 682.) The Cafferos were charged with murder and felony child abuse (Pen. Code, § 273a, subd. (1)). The superior court granted the defendants' motion to dismiss the murder charge. The prosecution appealed arguing that felony child endangerment was appropriate for second degree felony murder.

The court began its analysis by noting the basic two arguments to challenge the suitability of felony child endangerment to support application of the second degree felony-murder rule: (1) whether section 273a, subdivision (1) defines an offense inherently dangerous to human life; and (2) whether it is integral to the homicide within the meaning of *People v. Ireland, supra*, 70 Cal.2d 522. (*People v. Caffero, supra*, 207 Cal.App.3d at p. 680.) *Caffero*

noted that two other cases had sustained second degree felony-murder convictions as against the *Ireland* challenge on the "unchallenged, unarticulated assumption that violation of section 273a, subdivision (1) is a felony inherently dangerous to human life. (*People v. Shockley, supra,* 79 Cal.App.3d at pp. 674-677; *People v. Northrop, supra,* 132 Cal.App.3d at pp. 1031-1040 . . . .)" (207 Cal.App.3d at p. 682.)[2] *Caffero* decided that the decision in *Burroughs* was "inconsistent with the continued indulgence of that assumption." (*Ibid.*)

*Caffero* noted that the statute analyzed in *Burroughs* was based on language similar to that in section 273a, subdivision (1) regarding conduct which created the risk or was likely to produce great bodily harm *or* death. (207 Cal.App.3d at pp. 682-683) *Burroughs* concluded that the statute treated death and great bodily harm as "discrete risks" and that injuries constituting great bodily harm did not rise to the level of being inherently life-threatening. (*Caffero,* 207 Cal.App.3d at p. 683.) Similarly, section 273a, subdivision (1) "is implicated in a wide range of circumstances including those likely to produce 'great bodily harm or death.' It also shares the same grammatical structure found significant in *Burroughs* in that it separates the life threatening risk, 'death,' from the nonlife-threatening risk, 'great bodily harm,' with the disjunctive 'or.' " (207 Cal.App.3d at p. 683.)

*Caffero* rejected the prosecution's argument that a higher degree of risk was implicit in section 273a, subdivision (1) because of its reference to circumstances or conditions "which cause or *create a risk*" of great bodily harm or death. "The comparatively higher probability of great bodily harm required by the latter section, however, remains irrelevant to the question of 'inherent danger to human life.' As we read *Burroughs,* even certainty of great bodily harm would not support an implication of inherent risk of death." (207 Cal.App.3d at pp. 683-684.) We agree.

Respondent argues that the conclusion reached in *Caffero* is no longer valid after the California Supreme Court's subsequent decision in *People v. Patterson, supra,* 49 Cal.3d 615, because the various types of prohibited conduct specified in Penal Code section 273a, subdivision (1) can be separated into qualifying inherently dangerous to life offenses and nonqualifying noninherently dangerous offenses. Respondent further argues that in viewing

---

[2] *People v. Shockley, supra,* 79 Cal.App.3d 669 and *People v. Northrop* (1982) 132 Cal.App.3d 1027 [182 Cal.Rptr. 197] held that section 273a was not integral to the homicide and did not violate the *Ireland* rule, and thus was appropriate to use the underlying felony for second degree murder. Neither case considered whether section 273a was inherently dangerous to human life, and *Northrop* was later overruled in *People v. Smith, supra,* 35 Cal.3d 798, 808. *Caffero* determined that section 273a was not inherently dangerous to human life and expressly held that its conclusion rendered the *Ireland* issue academic. (*People v. Caffero, supra,* 207 Cal.App.3d at p. 681.)

the statute in the abstract, only the specific type of proscribed conduct (neglect permitting the person or health of a child to be endangered) should be considered and that such segregated conduct is inherently dangerous to life. We conclude that as applicable to Penal Code section 273a, subdivision (1), respondent's argument is unmeritorious.

The "inherently dangerous" test was extensively analyzed in *Patterson*. The underlying felony was furnishing cocaine (Health & Saf. Code, § 11352).[3] The trial court refused to permit the prosecution to advance a second degree felony murder theory based on this felony because of the broad language of the statute: it could be violated in various nonhazardous ways, such as transporting or offering to transport controlled substances. While defendant was charged with furnishing, the statute must be analyzed in the abstract, and the trial court concluded that violations of section 11352 could not be characterized as inherently dangerous based on *Burroughs*. (49 Cal.3d at pp. 619-620, 622-623.)

The Supreme Court in *Patterson* reaffirmed the principle that the elements of the felony offense must be examined in the abstract to determine if it is an inherently dangerous felony. (49 Cal.3d at p. 622.) It also acknowledged the *Henderson* bipartite test of examining the primary element of the offense and the elements which raise the offense to a felony. (*Id.* at p. 625.) However, it noted that Health and Safety Code section 11352 proscribes conduct other than furnishing cocaine, and "the issue still to be resolved is whether we must consider only the specific offense of furnishing cocaine or the entire scope of conduct prohibited by the statute." (*Id.* at p. 622.)

"The fact that the Legislature has included a variety of offenses in Health and Safety Code section 11352 does not require that we treat them as a unitary entity. Rather, we must decide whether in '[r]eading and considering the statute as a whole in order to determine the true legislative intent . . . we find [a] basis for severing' the various types of conduct it forbids. (*People* v. *Henderson, supra,* 19 Cal.3d at p. 95.) There are more than 100 different controlled substances that fall within the confines of Health and Safety Code section 11352. To create statutes separately proscribing the importation, sale,

---

[3]Health and Safety Code section 11352 provides:

"Except as otherwise provided in this division, every person who transports, imports into this state, sells, furnishes, administers, or gives away, or offers to transport, import into this state, sell, furnish, administer, or give away, or attempts to import into this state or transport (1) any controlled substance specified in subdivision (b), (c), or (e), or paragraph (1) of subdivision (f) of Section 11054, specified in paragraph (14), (15), or (20) of subdivision (d) of Section 11054, or specified in subdivision (b), (c), or (g) of Section 11055, or (2) any controlled substance classified in Schedule III, IV, or V which is a narcotic drug, unless upon the written prescription of a physician, dentist, podiatrist, or veterinarian licensed to practice in this state, shall be punished by imprisonment in the state prison for three, four, or five years."

furnishing, administration, etc., of each of these drugs, would require the enactment of hundreds of individual statutes. It thus appears that for the sake of convenience the Legislature has included the various offenses in one statute.

"The determination whether a defendant who furnishes cocaine commits an inherently dangerous felony should not turn on the dangerousness of other drugs included in the same statute, such as heroin and peyote; nor should it turn on the danger to life, if any, inherent in the transportation or administering of cocaine. Rather, each offense set forth in the statute should be examined separately to determine its inherent dangerousness." (49 Cal.3d at pp. 624-625.) The trial court incorrectly analyzed section 11352 in its entirety to determine whether defendant committed an inherently dangerous felony by violating section 11352. Instead, the trial court should have examined the narrow offense of furnishing cocaine to determine whether it is an inherently dangerous felony. (49 Cal.3d at p. 625.)

In the instant case, the underlying felony is child endangerment. As discussed above, Penal Code section 273a, subdivision (1) contains broad language proscribing both active and passive child abuse. *Patterson* requires an initial analysis of the statute to determine if the particular charged offense should be separately examined from the rest of the statute to determine whether it is inherently dangerous to human life.

The language of section 273a, subdivision (1) distinguishes itself from the statute analyzed in *Patterson*. Health and Safety Code section 11352, while including many various types of proscribed conduct as well as substances, does not contain any language equivalent to "under circumstances or conditions likely to produce great bodily harm or death." To the contrary, section 273a, subdivision (1) contains that language and condition as a necessary prerequisite element *to each and every conceivable type* of conduct thereafter defined. (*People* v. *Smith, supra,* 35 Cal.3d 798, 806.) Each separately examined offense has as a necessary element that it be committed under circumstances or conditions likely to produce great bodily harm *or death.* Thus, even if the *Patterson* separate examination analysis is used, respondent's position fails under the conclusive definition of similar language elevating the offense to a felony contained in *Burroughs.* (*People* v. *Burroughs, supra,* 49 Cal.3d 824, 831.)

Respondent argues that section 273a is designed to protect the "most vulnerable group in society," and that the younger the child, the more life threatening the conduct. While this is certainly true, it cannot be ignored that the statute merely refers to "children" without distinction by age or infancy, and thus applies to all minors below the age of 18 years. (Civ. Code, § 25.)

In contrast, Penal Code section 271, for example, proscribes the desertion of a child under the age of 14 years, while section 271a similarly proscribes the willful abandonment or failure to maintain a child under the age of 14 years. Section 273a cannot be narrowly interpreted to apply to the most "vulnerable" and "younger" minors of society based on the express language of the statute, given the basic requirement that we must examine the statute in the abstract rather than on the facts of the particular offense.

*Caffero* similarly rejected the prosecution's attempt to distinguish section 273a, subdivision (1) because it pertains only to children who are less able as a group than adults to recover from serious injury and thus more likely to suffer death. "We are not persuaded. Considering the statute, as we must, in the abstract, the People's argument necessarily assumes that a normal 17-year-old minor is especially vulnerable to the same degree as the premature infant in this case. This is plainly contrary to reason. For example, a fracture of a limb although deemed 'great bodily harm' is not likely to endanger the life of an infant, much less of a 17-year-old." (*People* v. *Caffero, supra,* 207 Cal.App.3d at p. 684.) The court acknowledged the special need of helpless children for full protection from the law, but it was compelled to the conclusion that felony child abuse is not inherently dangerous to human life, based on the application of the *Burroughs* analysis to the "functionally indistinguishable language of section 273a, subdivision (1)." (*Id.* at p. 684.) Again, we agree. This court is bound by the California Supreme Court's analysis of the child endangerment statute contained in *Smith* and its analysis of similar language in *Burroughs,* in reaching the conclusion that section 273a, subdivision (1) is not an offense "inherently dangerous to life" for the purposes of the felony-murder rule. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)[4]

The jury was instructed on two theories of second degree murder: felony murder and implied malice. Instruction on the felony-murder theory constituted prejudicial error requiring reversal of appellants' convictions of second degree murder, because it cannot be determined whether the jury reached its verdict based upon a theory of implied malice, as to which we will find appellants' contentions on appeal unmeritorious, or felony murder. (*People* v. *Smith, supra,* 35 Cal.3d 798, 808.)

## II.-VIII.*

. . . . . . . . . . . . . . . . . . . . . . . . .

[4]Even if respondent's argument regarding *Patterson* were accepted, we note that the jury was instructed pursuant to section 273a, subdivision (1) in its entirety.

*See footnote, *ante,* page 1214.

## DISPOSITION

Appellants' convictions of child endangerment (Pen. Code, § 273a, subd. (1)), are affirmed.

Appellants' convictions of second degree murder are reversed.

The judgment as to each appellant is remanded to the trial court for further appropriate proceedings.

Martin, Acting P. J., and Franson, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied January 8, 1992.

---

*Retired Presiding Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.