Filed 8/22/25  P. v. Ulloa CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARTURO JAVIER ULLOA,<br><br>    Defendant and Appellant. | D084217<br><br><br><br>(Super. Ct. No. SCN440789) |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel F. Link, Judge.  Affirmed.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Heather B. Arambarri and Steve Oettting, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Arturo Javier Ulloa brutally stabbed his fiancée 25 times with a steak knife while her two young children stood about three feet away. He then attempted to carjack a neighbor's vehicle while fleeing. A jury found defendant guilty of three felonies — attempted murder, aggravated mayhem, and attempted carjacking — and two counts of misdemeanor child endangerment. The trial court sentenced defendant to prison for 64 years to life on the felonies, and to time served on the misdemeanors. On appeal, defendant challenges only the sufficiency of the evidence supporting his misdemeanor child endangerment convictions. (Pen. Code,[1] § 273a, subd. (b).) We conclude the record supports those convictions. Accordingly, we affirm the judgment.

# II. FACTUAL AND PROCEDURAL BACKGROUND

## A. Factual Background

In July 2022, defendant began dating Cassandra O., who had a son (Son) who was then around seven years old and a daughter (Daughter) who was then around four years old. A few months later, defendant and Cassandra got engaged and moved with Son and Daughter into a small apartment in Escondido. The children viewed defendant as a father figure. The apartment was small — a one-bedroom unit about "as big as a studio" — and the living room and kitchen "kind of mesh[ed] together." Defendant and Cassandra slept on the living room floor; the children slept in the bedroom.

Around 5:30 a.m. on February 1, 2023, Cassandra awoke to find defendant on top of her, lightly choking her. Cassandra was confused and thought defendant might be feeling playful. She pushed him off and asked

---

[1]     Undesignated statutory references are to the Penal Code.

what he was doing.  Defendant did not respond and his face looked "scary." As Cassandra lay in bed debating whether to go back to sleep, defendant "jumped on top of [her] and really started choking [her]."  Cassandra tried to speak but defendant covered her mouth with one hand while still choking her with the other.  Cassandra bit his fingers, freed herself, and yelled loudly for defendant to leave.

The yelling woke Daughter, who came to the living room doorway and said, "Why are you yelling at Daddy Arturo?  I love him.  You're breaking my heart."  For protection, Cassandra got a steak knife from the adjoining kitchen and held it at her side to conceal it from Daughter.  To encourage defendant to leave, Cassandra texted his sister and began videorecording him with her cellphone.  Defendant grabbed the phone and knife from Cassandra, breaking the knife's blade from the handle.  Defendant put the broken blade and handle in his pocket.  Cassandra grabbed another knife but defendant took it from her.  Defendant got Cassandra on the ground, pinned her down, and began stabbing her.  Cassandra could not get up so she screamed for help.

The second knife broke so defendant got up to get another one. Cassandra tried to get up but defendant pushed her back down.  At one point, Cassandra was on her hands and knees and defendant kicked her head, sending her "flying into the kitchen."  There was "a lot of wrestling, stabbing everywhere."  Defendant "was really focused on [Cassandra's] neck" and face, stabbing completely through one of her cheeks.  At some point, defendant grabbed Cassandra's head and "slit [her] throat."  Defendant sometimes held the knife over his head and plunged it down at Cassandra.  The knives kept breaking because they were poorly made, so defendant would get

3

replacements from the kitchen.  Defendant went through a total of five knives and stabbed Cassandra 25 times.

During the melee, Daughter woke Son.  The children entered the living room and stood — in shock — about three feet from the wrestling and stabbing.  Even though the children "were right there," defendant "didn't even notice them there and was on top of [Cassandra] stabbing [her]."  Son asked, "Is this real?"  Cassandra responded that it was and told him to go to the neighbors' apartment for help.  Son snuck out the bedroom window wearing only a tank top and underwear.  The attack continued "for some time after that."

As Cassandra began to feel like she "didn't . . . ha[ve] any more energy to fight," she raised a hand and said, "God, please help me."  Defendant abruptly "stopped and walked out the door."  Cassandra crawled to the door, locked it, and called 911.

Meanwhile, an employee in the parking lot of a business next door heard a "pretty loud" disturbance at the apartment complex.  He looked over and saw Son alone in the apartment parking lot.  The employee also saw defendant, covered in blood, leave the apartment.

Around the same time, a young woman (Rosa) who lived in the apartment complex was leaving for work in her vehicle and saw Son outside screaming for help.  Rosa stopped, rolled down her window, and asked Son what he needed.  She could hear loud screaming coming from the apartment.  Son asked Rosa to call 911 so she did.  After Rosa hung up from the 911 call, defendant approached her vehicle and said, " 'Get the fuck out of the car or I'm going to kill you.' "  Defendant tried to open the doors but they were locked.  Rosa called 911 again and defendant fled on foot.

4

Police responded and apprehended defendant. One of the officers testified the apartment "looked like a bomb went off" — "things were knocked over," "there was a bunch of stuff everywhere," and blood was in "places you think blood couldn't get."

Medical personnel transported Cassandra to the hospital where she was treated by trauma and reconstructive surgeons. She survived her injuries but has scars from every stab wound.

Daughter and Son made spontaneous statements to a responding police officer. Daughter volunteered, "My dad was stabbing my mom; there was blood all over the place." Daughter said defendant was "biting [Cassandra] like a vampire." Son corrected Daughter, "No, no, no. He was stabbing her with a knife." Son added that he saw defendant stab Cassandra "about 20 times."

Defendant did not present any evidence.

## B. Procedural Background

Defendant was charged with five crimes: (1) attempted murder as to Cassandra (§§ 664, 187, subd. (a)), with allegations that the offense was willful, deliberate, and premediated (§ 189), that defendant and Cassandra were in a dating relationship (§ 1203.097, subd. (a); Fam. Code, § 6211), that defendant personally used a knife (§ 12022, subd. (b)), and that he inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)); (2) aggravated mayhem as to Cassandra (§ 205); (3) attempted carjacking as to Rosa (§§ 664, 215, subd. (a)); (4) felony child endangerment as to Daughter (§ 273a, subd. (a)); and (5) felony child endangerment as to Son (*ibid.*). The jury found defendant guilty on all charges relating to Cassandra and Rosa and made true findings on the allegations attached to the attempted murder count. The jury found

5

defendant not guilty on the felony child endangerment counts but found him guilty of the two lesser included offenses of misdemeanor child endangerment. (§ 273a, subd. (b).)

Defendant admitted having one prior serious felony conviction (§ 667, subd. (a)(1)) and 11 prior strike convictions (§§ 667, subd. (b)–(i), 1170.12). In a bifurcated trial, the court found several aggravating factors true beyond a reasonable doubt.

The trial court sentenced defendant to 64 years to life on the felony convictions relating to Cassandra and Rosa, and to time served on the misdemeanor convictions relating to Daughter and Son.

## III. DISCUSSION

Defendant's sole contention on appeal is that insufficient evidence supports his convictions for misdemeanor child endangerment. We disagree.

### A. Relevant Legal Principles

Section 273a "is an omnibus statute that proscribes essentially four branches of conduct." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 (*Sargent*); see *In re L.K.* (2011) 199 Cal.App.4th 1438, 1445.) Those branches are: "[(1)] willfully caus[ing] or permit[ting] any child to suffer, or [(2)] inflict[ing] thereon unjustifiable physical pain or mental suffering, or [(3)] having the care or custody of any child, willfully caus[ing] or permit[ting] the person or health of that child to be injured, or [4] willfully caus[ing] or permit[ting] that child to be placed in a situation where his or her person or

6

health may be endangered." (§ 273a, subds. (a), (b);[2] see *People v. Moussabeck* (2007) 157 Cal.App.4th 975, 980.)

A violation of section 273a " 'can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect.' " (*Sargent*, *supra*, 19 Cal.4th at pp. 1215–1216.) "When the harm to a child is directly inflicted, the requisite mental state for the section 273a offense is general criminal intent. [Citations.] When that harm is indirectly inflicted, the requisite mental state is criminal negligence. [Citations.] Criminal negligence is aggravated, culpable, gross or reckless conduct that is such a departure from that of the ordinarily prudent or careful person under the same circumstances as to be incompatible with a proper regard for human life. [Citation.] A defendant may be deemed to be criminally negligent if a reasonable person in his position would have been aware of the risk." (*Burton*, *supra*, 143 Cal.App.4th at p. 454; see *Sargent*, at pp. 1215–1216; *Valdez*, *supra*, 27 Cal.4th at p. 783.)

---

[2]    Section 273a, subdivision (b) sets forth the misdemeanor form of child endangerment as follows: "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor." Subdivision (a) of the statute sets forth the felony form of the offense. "The primary difference between the two subdivisions is that subdivision (a) requires the proscribed conduct occur under 'circumstances or conditions likely to produce great bodily harm or death'; subdivision (b) . . . has no such requirement." (*People v. Valdez* (2002) 27 Cal.4th 778, 783, fn. 3 (*Valdez*); see *People v. Burton* (2006) 143 Cal.App.4th 447, 454, fn. 4 (*Burton*).)

The People charged defendant under the fourth branch of section 273a, which is an indirect form of violating the statute. (*In re L.K.*, *supra*, 199 Cal.App.4th at p. 1445.) Accordingly, the People were required to prove that defendant, acting with criminal negligence, and having Daughter and Son in his care or custody (a point defendant does not dispute on appeal), placed them in a situation where their person or health may be endangered. The trial court instructed the jury regarding these principles with CALCRIM No. 823.

" ' "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] . . . '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility." ' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117–1118.)

**B. Analysis**

Substantial evidence supports the jury's findings that defendant placed Daughter and Son in a situation where their person or health may be endangered and that he acted with criminal negligence in doing so.

The jury could reasonably find that defendant endangered Daughter's and Son's physical safety by brutally attacking their mother while they were only about three feet away. The attack began in the confined living room of

8

small apartment unit. The fighting, however, did not remain confined. There was "[a] lot of wrestling" and "stabbing *everywhere*" (italics added); defendant kicked Cassandra's head so hard she flew from the living room to the kitchen; and the apartment looked "like a bomb went off" — "things were knocked over," "there was a bunch of stuff everywhere," and blood was in "places you think blood couldn't get." The fighting was so intense that one neighbor heard it from inside her running car in the apartment complex parking lot and an employee at the adjacent property heard it from his location. During the commotion, defendant seemed oblivious to the fact the children were within feet of him as he continued attacking Cassandra, at times raising the knife over his head and plunging it down into her. Although the children were not physically injured, the jury could reasonably conclude on this record that defendant's brutal attack on Cassandra within mere feet of the children placed them in danger of suffering physical injury. It is legally inconsequential that defendant inflicted no actual physical harm on the children; it is sufficient that he merely exposed them to the risk of it. (See *People v. Lee* (1991) 234 Cal.App.3d 1214, 1220 [stating with respect to the felony offense that "[i]t is the likelihood of foreseeable injury, rather than whether such injury in fact occurs, that is relevant"]; see, e.g., *People v. Little* (2004) 115 Cal.App.4th 766, 771–772 [holding substantial evidence supported the defendant's misdemeanor child endangerment conviction where he left a six- to 12-month-old child unattended on a three-foot-tall bed without restraints or railings, even though the child never fell off the bed]; *People v. Perez* (2008) 164 Cal.App.4th 1462, 1473 [holding substantial evidence supported the defendant's misdemeanor child endangerment conviction

9

where he left bindles of drugs and syringes within reach of a four-year-old, even though the child never accessed the contraband].)[3]

Defendant acknowledges the jury could have found he acted with criminal negligence *as to Cassandra*, but he maintains "the record lacks sufficient evidence that [he] acted with criminal negligence towards [Daughter] or [Son]." We disagree. The jury — composed of reasonable people — could conclude on the record here that "a reasonable person in [defendant's] position would have been aware of the risk" his brutal attack on Cassandra posed to the physical safety of her nearby children. (*Burton, supra*, 143 Cal.App.4th at p. 454.)

---

[3] Because substantial evidence supports the finding that defendant endangered the children's "persons," we need not address the People's alternative argument that the fourth branch of section 273a is satisfied when a child's *mental* "health" is endangered. (See § 273a, subd. (b) [the offense involves endangering a child's "person or health"]; *Burton, supra,* 143 Cal.App.4th at pp. 455–457 [finding substantial evidence supported convictions under the first and second branches of § 273a where the defendant slashed his wife with a knife while her son was nearby; although the child was not in physical danger, he was traumatized by seeing the bloody aftermath].)

## IV.  DISPOSITION

The judgment is affirmed.


RUBIN, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.