STATE

v.

Tracy STEWART.

No. 93–199–C.A.

Supreme Court of Rhode Island.

Aug. 11, 1995.

Jane McSoley, Assistant Attorney General, Aaron Weisman, Chief Appellate Division, Jeffrey Pine, Attorney General, Providence, for plaintiff.

Paula Rosin, Chief Appellate Attorney, Office of Public Defender, Richard Casparian, Public Defender, Providence, for defendant.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on the appeal of the defendant, Tracy Stewart, from a judgment of conviction entered in the Superior Court on one count of second-degree murder in violation of G.L.1956 (1981 Reenactment) § 11–23–1.[1] We affirm the judgment of conviction. The facts insofar as pertinent to this appeal are as follows.

On August 31, 1988 twenty-year-old Tracy Stewart (Stewart or defendant) gave birth to a son, Travis Young (Travis). Travis's father was Edward Young, Sr. (Young). Stewart and Young, who had two other children together, were not married at the time of Travis's birth.[2] Travis lived for only fifty-two days, dying on October 21, 1988, from dehydration.

During the week prior to Travis's death, Stewart, Young, and a friend, Patricia McMasters (McMasters), continually and repeatedly ingested cocaine over a two- to three-consecutive-day period at the apartment shared by Stewart and Young. The baby, Travis, was also present at the apartment while Stewart, Young, and McMasters engaged in this cocaine marathon. Young and McMasters injected cocaine intravenously and also smoked it while Stewart ingested the cocaine only by smoking it. The smoked cocaine was in its strongest or base form, commonly referred to as "crack." When the

---

1. Having found Stewart guilty of second-degree murder and wrongfully causing or permitting a child to be a habitual sufferer for want of food and proper care, which were the first two counts of a three-count indictment, the jury did not decide the third count of the indictment—manslaughter. Upon conviction of the underlying count of wrongfully causing or permitting a child to be a habitual sufferer for want of food or proper care, that count merged with the felony-murder count. *See State v. Baton,* 488 A.2d 696, 703–04 (R.I.1985). Counsel for the state dismissed the second and third counts of the indictment at sentencing pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. Edward Young, Sr., the child's father, was charged with the same offenses in the same indictment. His case has not yet been tried.

2. Subsequent to her trial, Stewart married Young. Several months later she filed for divorce.

three exhausted an existing supply of cocaine, they would pool their money and Young and McMasters would go out and buy more with the accumulated funds. The primary source of funds from which the three obtained money for this cocaine spree was Stewart's and McMasters's Aid to Families with Dependent Children (AFDC) checks. Stewart and McMasters had each just received the second of their semimonthly AFDC checks. They both cashed their AFDC checks and gave money to Young, which he then used to purchase more cocaine. After all the AFDC funds had been spent on cocaine and the group had run out of money, McMasters and Young committed a robbery to obtain additional money to purchase more cocaine.

The cocaine binge continued uninterrupted for two to three days. McMasters testified that during this time neither McMasters nor Stewart slept at all. McMasters testified that defendant was never far from her during this entire two- to three-day period except for the occasions when McMasters left the apartment to buy more cocaine. During this entire time, McMasters saw defendant feed Travis only once. Travis was in a walker, and defendant propped a bottle of formula up on the walker, using a blanket, for the baby to feed himself. McMasters testified that she did not see defendant hold the baby to feed him nor did she see defendant change Travis's diaper or clothes during this period.

Ten months after Travis's death defendant was indicted on charges of second-degree murder, wrongfully causing or permitting a child under the age of eighteen to be a habitual sufferer for want of food and proper care (hereinafter sometimes referred to as "wrongfully permitting a child to be a habitual sufferer"), and manslaughter. The second-degree-murder charge was based on a theory of felony murder. The prosecution did not allege that defendant intentionally killed her son but rather that he had been killed during the commission of an inherently dangerous felony, specifically, wrongfully permitting a child to be a habitual sufferer. Moreover, the prosecution did not allege that defendant intentionally withheld food or care from her son. Rather the state alleged that

because of defendant's chronic state of cocaine intoxication, she may have realized what her responsibilities were but simply could not remember whether she had fed her son, when in fact she had not.

At defendant's trial both the prosecution and the defense presented expert medical witnesses who testified concerning what they believed to be the cause of Travis's death. The experts for both sides agreed that the cause of death was dehydration, but they strongly disagreed regarding what caused the dehydration. The prosecution expert witnesses believed that the dehydration was caused by insufficient intake of food and water, that is, malnutrition. The defense expert witnesses, conversely, believed that the dehydration was caused by a gastrointestinal virus known as gastroenteritis which manifested itself in an overwhelming expulsion of fluid from the baby's body.

The defendant was found guilty of both second-degree murder and wrongfully permitting a child to be a habitual sufferer. A subsequent motion for new trial was denied. This appeal followed. In support of her appeal defendant raises a number of issues. We shall address them in the order in which they are presented in defendant's brief. Additional facts will be furnished as needed in order to deal with specific issues.

I

## THE DENIAL OF THE MOTION TO DISMISS

Prior to trial, defendant moved to dismiss count 1 of the indictment, the second-degree felony-murder charge, on two grounds that are relevant to her appeal. She first claimed that count 1 of the indictment was improperly charged. She claimed that the charge should have been no greater than involuntary manslaughter. The basis of defendant's claim is that the predicate felony underlying the felony-murder charge, wrongfully permitting a child to be a habitual sufferer, is not an inherently dangerous felony as charged in the indictment. The second ground on which defendant sought to have the felony-murder charge dismissed was that the statute under which she was charged, Rhode Island's child-

neglect statute, G.L.1956 (1981 Reenactment) § 11–9–5, lacked a mens rea element, and additionally, that count 2 of the indictment, which served as the predicate to the felony-murder charge in count 1, was defective because it did not track the language of the child-neglect statute. The word "wrongfully" appears in § 11–9–5, but the indictment did not include this word to describe the charged conduct. The motion to dismiss was denied on both grounds. The defendant claims that the denial of the motion to dismiss was reversible error. We disagree.

At the pretrial hearing on the motion to dismiss, defendant argued that the law in Rhode Island is moving toward the approach used in California to determine if a felony is inherently dangerous. This approach examines the elements of a felony in the abstract. We shall discuss this approach in more detail in part II A of this opinion. In denying the motion to dismiss, the trial justice stated that "[n]othing * * * in my examination of Rhode Island case law, leads the Court to conclude that the Rhode Island Supreme Court is moving toward the California concept." Rather than determine if the crime of wrongfully permitting a child to be a habitual sufferer was inherently dangerous in the abstract, the trial justice ruled that the state would have the opportunity to prove at trial that the crime was inherently dangerous in the manner that it was committed. The trial justice committed no error in so ruling.

█ The trial justice held that the mens rea issue could be cured by an appropriate instruction to the jury and denied the motion to dismiss based on this ground as well. She noted that count 2 of the indictment charged defendant with violating § 11–9–5, "and there's no question but that [§] 11–9–5 talks about wrongful actions." The trial justice was correct in holding that the indictment did not have to track the exact words of the statute. *See State v. Markarian*, 551 A.2d 1178, 1182 (R.I.1988) ("as long as the essential elements of the crimes charged are stated in the indictment or information, a defendant's conviction may be reversed only where the variance is prejudicial to his defense"); *State v. McKenna*, 512 A.2d 113, 114–15 (R.I. 1986). Aside from omitting the word "wrongfully," count 2 did set forth the essential elements of a violation of § 11–9–5. The defendant was not prejudiced by the omission of the word "wrongfully" from count 2 since the trial justice was correct in asserting that the omission could be cured with an appropriate jury instruction. The trial justice, therefore, committed no error in denying the motion to dismiss on this basis.

## II

### THE DENIAL OF THE MOTIONS FOR JUDGMENT OF ACQUITTAL

The defendant moved for judgment of acquittal on all three counts at the close of the state's case and again at the close of all the evidence. In regard to the felony-murder charge defendant claimed that the evidence was insufficient to prove (1) that the crime of wrongfully permitting a child to be a habitual sufferer is an inherently dangerous felony and (2) that defendant intentionally committed the crime of wrongfully permitting a child to be a habitual sufferer. The motions for judgment of acquittal were denied on both grounds. The defendant claims that the denial of her motions for judgment of acquittal was reversible error.

### A

### Whether Wrongfully Permitting a Child to Be a Habitual Sufferer is an Inherently Dangerously Felony

Rhode Island's murder statute, § 11–23–1, enumerates certain crimes that may serve as predicate felonies to a charge of first-degree murder. A felony that is not enumerated in § 11–23–1 can, however, serve as a predicate felony to a charge of second-degree murder. *See In re Leon*, 122 R.I. 548, 410 A.2d 121 (1980); *State v. Miller*, 52 R.I. 440, 161 A. 222 (1932). Thus the fact that the crime of wrongfully permitting a child to be a habitual sufferer is not specified in § 11–23–1 as a predicate felony to support a charge of first-degree murder does not preclude such crime from serving as a predicate to support a charge of second-degree murder.

█ In Rhode Island second-degree murder has been equated with common-law mur-

der. *In re Leon,* 122 R.I. at 553, 410 A.2d at 124. At common law, where the rule is unchanged by statute, "[h]omicide is murder if the death results from the perpetration or attempted perpetration of an inherently dangerous felony." *Id.* (quoting Perkins, *Criminal Law* 44 (2d ed. 1969)). To serve as a predicate felony to a charge of second-degree murder, a felony that is not specifically enumerated in § 11–23–1 must therefore be an inherently dangerous felony. *Id.*

The defendant contends that wrongfully permitting a child to be a habitual sufferer is not an inherently dangerous felony and cannot therefore serve as the predicate felony to a charge of second-degree murder. In advancing her argument, defendant urges this court to adopt the approach used by California courts to determine if a felony is inherently dangerous. This approach requires that the court consider the elements of the felony "in the abstract" rather than look at the particular facts of the case under consideration. *See, e.g., People v. Patterson,* 49 Cal.3d 615, 620–21, 778 P.2d 549, 553, 262 Cal.Rptr. 195, 199 (1989). With such an approach, if a statute can be violated in a manner that does not endanger human life, then the felony is not inherently dangerous to human life. *People v. Burroughs,* 35 Cal.3d 824, 830–33, 678 P.2d 894, 898–900, 201 Cal.Rptr. 319, 323–25 (1984); *People v. Caffero,* 207 Cal.App.3d 678, 683–84, 255 Cal. Rptr. 22, 25 (1989). Moreover, the California Supreme Court has defined an act as "inherently dangerous to human life when there is 'a *high probability* that it will result in death.'" *Patterson,* 49 Cal.3d at 627, 262 Cal.Rptr. at 204, 778 P.2d at 558.

In *Caffero, supra,* a two-and-one-half-week-old baby died of a massive bacterial infection caused by lack of proper hygiene that was due to parental neglect. The parents were charged with second-degree felony murder and felony-child abuse, with the felony-child-abuse charge serving as the predicate felony to the second-degree-murder charge. Examining California's felony-child-abuse statute in the abstract, instead of looking at the particular facts of the case, the court held that because the statute could be violated in ways that did not endanger hu-

man life, felony-child abuse was not inherently dangerous to human life. *Caffero,* 207 Cal.App.3d at 683, 255 Cal.Rptr. at 25. By way of example, the court noted that a fractured limb, which comes within the ambit of the felony-child-abuse statute, is unlikely to endanger the life of an infant, much less of a seventeen-year-old. *Id.* (the statute applied to all minors below the age of eighteen years, not only to young children. *People v. Lee,* 234 Cal.App.3d 1214, 1228, 286 Cal.Rptr. 117, 126 (1991)). Because felony-child abuse was not inherently dangerous to human life, it could not properly serve as a predicate felony to a charge of second-degree felony murder. *Caffero,* 207 Cal.App.3d at 682–83, 255 Cal.Rptr. at 24–25; *see also Lee,* 234 Cal. App.3d at 1229, 286 Cal.Rptr. at 126.

The defendant urges this court to adopt the method of analysis employed by California courts to determine if a felony is inherently dangerous to life. Aside from California, it appears that Kansas is the only other state which looks at the elements of a felony in the abstract to determine if such felony is inherently dangerous to life. *See, e.g., State v. Wesson,* 247 Kan. 639, 647, 802 P.2d 574, 581 (1990) (holding that the sale of crack cocaine when viewed in the abstract is not inherently dangerous to human life); *State v. Underwood,* 228 Kan. 294, 303, 615 P.2d 153, 161 (1980) (holding that the unlawful possession of a firearm by an ex-felon when viewed in the abstract is not inherently dangerous to human life). The case of *Ford v. State,* 262 Ga. 602, 423 S.E.2d 255 (1992), cited in defendant's brief for the proposition that possession of a firearm by an ex-felon is not an inherently dangerous felony which can support a felony-murder conviction, actually holds that the attendant circumstances of the particular case should be considered in determining whether the underlying felony "create[d] a foreseeable risk of death." In *Ford* the defendant (Ford) had previously been convicted of the felony of possession of cocaine with intent to distribute. Ford was visiting the home of his girlfriend's mother and had brought with him a semiautomatic pistol. While there he attempted to unload the pistol, but in so doing, he discharged the weapon, sending a bullet both through the floor and through the ceiling of a basement

apartment located in the house. The bullet struck and killed the occupant of the basement apartment. There was no evidence that at the time of the shooting the defendant was aware of the existence of the apartment or of the victim's presence in it. Ford was charged with and convicted of felony murder, with the underlying felony being the possession of a firearm by a convicted felon.

The Georgia Supreme Court reversed the conviction for felony murder holding that a status felony, including the possession of a firearm by a previously-convicted felon, is not inherently dangerous. The court explained that there could indeed be circumstances in which such a felony could be considered dangerous (for example when the possession of the firearm was coupled with an aggravated assault or other dangerous felony) but that such circumstances were absent in that case. It held that in *that particular case*, which did not involve an assault or other criminal conduct, the underlying felony of possession of a firearm by a previously convicted felon was not inherently dangerous and thus could not serve as a predicate to the charge of felony murder. *Id.* at 603–04, 423 S.E.2d at 256.

■ We decline defendant's invitation to adopt the California approach in determining whether a felony is inherently dangerous to life and thus capable of serving as a predicate to a charge of second-degree felony murder. We believe that the better approach is for the trier of fact to consider the facts and circumstances of the particular case to determine if such felony was inherently dangerous in the manner and the circumstances in which it was committed, rather than have a court make the determination by viewing the elements of a felony in the abstract. We now join a number of states that have adopted this approach. *See, e.g., Jenkins v. State,* 230 A.2d 262 (Del.1967); *State v. Wallace,* 333 A.2d 72 (Me.1975); *Commonwealth v. Ortiz,* 408 Mass. 463, 560 N.E.2d 698 (1990); *State v. Harrison,* 90 N.M. 439, 564 P.2d 1321 (1977); *State v. Nunn,* 297 N.W.2d 752 (Minn.1980).

A number of felonies at first glance would not appear to present an inherent danger to human life but may in fact be committed in such a manner as to be inherently dangerous to life. The crime of escape from a penal facility is an example of such a crime. On its face, the crime of escape is not inherently dangerous to human life. But escape may be committed or attempted to be committed in a manner wherein human life is put in danger. Indeed in *State v. Miller, supra,* this court upheld the defendant's conviction of second-degree murder on the basis of the underlying felony of escape when a prison guard was killed by an accomplice of the defendant during an attempted escape from the Rhode Island State prison. By way of contrast, the California Supreme Court has held that the crime of escape, viewed in the abstract, is an offense that is not inherently dangerous to human life and thus cannot support a second-degree felony-murder conviction. *People v. Lopez,* 6 Cal.3d 45, 51, 489 P.2d 1372, 1376, 98 Cal.Rptr. 44, 48 (1971) (In Bank).

The amendment of our murder statute to include any unlawful killing "committed during the course of the perpetration, or attempted perpetration, of felony manufacture, sale, delivery, or other distribution of a controlled substance otherwise prohibited by the provisions of chapter 28 of title 21" lends further support for not following California's approach to determining the inherent dangerousness of a felony. G.L.1956 (1981 Reenactment) § 11–23–1, as amended by P.L. 1990, ch. 284, § 4. According to the statute a person who delivers phencyclidine (PCP), a controlled substance under section (e)(5) of schedule II of G.L.1956 (1989 Reenactment) § 21–28–2.08, as amended by P.L.1991, ch. 211, § 1, to another person who then dies either as a result of an overdose or as a result of behavior precipitated by the drug use (such as jumping off a building because of the loss of spacial perception) could be charged with first-degree murder under § 11–23–1. Conversely, the California Court of Appeal has held that when viewed in the abstract, the standard used by California courts to determine whether a felony is inherently dangerous, the furnishing or selling of PCP is not a felony that carries a high probability that death will result. *People v. Taylor,* 6 Cal.App.4th 1084, 1100, 8 Cal. Rptr.2d 439, 449 (1992). Consequently, the

California Court of Appeal held that the felony of furnishing PCP could not serve as a predicate to a charge of second-degree felony murder. *Id.* at 1101, 8 Cal.Rptr.2d at 450. It is clear that there is a profound ideological difference in the approach of the Rhode Island Legislature from the holdings of the courts of the State of California concerning appropriate criminal charges to be preferred against one who furnishes PCP (and presumably a host of other controlled substances) to another person with death resulting therefrom. The lawmakers of the State of Rhode Island have deemed it appropriate to charge such a person with the most serious felony in our criminal statutes—first-degree murder. It appears that the appellate court of California, however, would hold that the most serious charge against one who furnishes PCP to another person with death resulting therefrom would be involuntary manslaughter. *See id.*

The Legislature's recent amendment to our murder statute as well as this court's prior jurisprudence concerning second-degree felony murder (*In re Leon, supra; State v. Miller, supra*) reinforces our belief that we should not adopt the California approach to determine whether a felony is inherently dangerous. The proper procedure for making such a determination is to present the facts and circumstances of the particular case to the trier of fact and for the trier of fact to determine if a felony is inherently dangerous in the manner and the circumstances in which it was committed. This is exactly what happened in the case at bar. The trial justice instructed the jury that before it could find defendant guilty of second-degree murder, it must first find that wrongfully causing or permitting a child to be a habitual sufferer for want of food or proper care was inherently dangerous to human life "in its manner of commission." This was a proper charge. By its guilty verdict on the charge of second-degree murder, the jury obviously found that wrongfully permitting a child to be a habitual sufferer for want of food or proper care was indeed a felony inherently dangerous to human life in the circumstances of this particular case.

"When presented with a motion for judgment of acquittal, a trial justice must determine whether the evidence offered by the state is capable of generating proof of guilt beyond a reasonable doubt. * * * To make this determination, a trial justice, and this court on review, must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and must draw therefrom all reasonable inferences consistent with guilt." *State v. Caruolo,* 524 A.2d 575, 580–81 (R.I.1987).

■ Applying this standard, we are of the opinion that the evidence offered by the state was sufficient to prove beyond a reasonable doubt each of the elements of second-degree felony murder, including that the crime of wrongfully permitting a child to be a habitual sufferer was an inherently dangerous felony in its manner of commission. The defendant's motions for judgment of acquittal on the felony-murder charge on the ground that wrongfully permitting a child to be a habitual sufferer is not an inherently dangerous felony were properly denied.

### B

**Whether Defendant Possessed the Necessary Intent to Commit the Crime of Wrongfully Permitting a Child to Be a Habitual Sufferer for Such Felony to Support a Charge of Second–Degree Felony Murder**

The theory of felony murder is that a defendant does not have to have intended to kill one who dies during the course of certain statutorily enumerated felonies, or other inherently dangerous felonies, in order to be charged with murder. The intent to commit the underlying felony will be imputed to the homicide, and a defendant may thus be charged with murder on the basis of the intent to commit the underlying felony. *See, e.g., State v. Villani,* 491 A.2d 976, 980 (R.I. 1985); 2 *Wharton's Criminal Law* § 147 (14th Torcia ed. 1979).

■ The defendant claims that the evidence presented at trial failed to establish that she intentionally committed the crime of wrongfully permitting a child to be a habitual

sufferer. She claims that absent an intent to commit this felony, it cannot serve as a predicate to support a charge of second-degree felony murder because there would then be no intent to be imputed from the underlying felony to the homicide. We agree with defendant that intent to commit the underlying felony is a necessary element of felony murder. However, we believe the circumstances surrounding the events preceding Travis's death support a finding that defendant did indeed intentionally permit her son to be a habitual sufferer for want of food or proper care.

The defendant's addiction to and compulsion to have cocaine were the overriding factors that controlled virtually every aspect of her life. She referred to the extended periods that she was high on cocaine as "going on a mission." Although she was receiving public assistance and did not have much disposable income, she nevertheless spent a great deal of money on cocaine, including her AFDC money. She shoplifted and traded the stolen merchandise for cocaine. She stole food because she had used the money that she should have been using to purchase food to purchase cocaine. The compulsion to have cocaine at any cost took precedence over every facet of defendant's life including caring for her children.

Although defendant did not testify at trial, she did testify before the grand jury. A redacted tape of her grand jury testimony was admitted into evidence and played for the jury at trial. During the days preceding Travis's death, defendant had been on a two- to three-day cocaine binge, a mission, as she referred to it. Her grand jury testimony indicated that she knew that during such periods she was unable to care for her children properly. The defendant testified that whenever she would go on a mission, her mother, who lived only a few houses away, would take and care for the children. This testimony evinced a knowledge on the part of defendant that she was incapable of properly caring for her children during these periods of extended cocaine intoxication. In addition, defendant was prone to petit mal seizures, which were exacerbated by her cocaine use. During such seizures she would "black out"

or "[go] into a coma state." She testified before the grand jury that she was aware that taking cocaine brought on more seizures and that the weekend before Travis died she had in fact blacked out and "went into a coma state."

Despite her grand jury testimony to the contrary, Travis remained with defendant at her apartment during the entire two- to three-day binge. He died two or three days later. The defendant's repeated voluntary and intentional ingestion of crack cocaine while her seven-week-old son was in her care in addition to her testimony that she knew that she was incapable of properly caring for her children during these extended periods of cocaine intoxication, support a finding that she intentionally permitted her son to be a habitual sufferer for want of food and proper care. We make the distinction between a finding that defendant intentionally deprived her son of food and proper care, which even the state does not allege, and a finding that defendant *intentionally permitted* her son to be a habitual sufferer for want of food or proper care, which we find to be supported by the evidence adduced at trial.

Viewing the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of witnesses, and drawing all reasonable inferences consistent with guilt, we are of the opinion that the evidence offered by the state was capable of proving beyond a reasonable doubt that defendant intentionally permitted her seven-week-old-son, Travis, to be a habitual sufferer for want of food and proper care. We also believe that the evidence in support of each of the other elements of the crime of second-degree felony murder was sufficient to justify a finding of proof beyond a reasonable doubt. The motions for judgment of acquittal were properly denied.

III

ADMISSION OF EVIDENCE OF OTHER CRIMES AND BAD ACTS

In her testimony before the grand jury, defendant explained that she was addicted to cocaine prior to becoming pregnant with Travis and that she continued to use cocaine

throughout her pregnancy on a daily basis. The defendant testified that during her pregnancy she was high on cocaine approximately nine hours per day and that after Travis was born she would get high approximately seven hours per day. She also testified that when Travis was born, a substantial amount of cocaine had been found in his system. The following colloquy took place between the prosecutor and defendant with respect to how defendant obtained money with which to purchase cocaine:

"Prosecutor: Now, Ms. Stewart, aside from using welfare money and other means, aside from using money you received by public assistance, were there other ways that you would get money?

"Defendant: Yes. I would borrow money or I would steal from the store, shoplifting, and trade it off, trade it off for the drugs.

"Prosecutor: How about breaking into apartments; did you ever break into apartments?

"Defendant: I broke into an apartment on Sayles Avenue, but what was stolen from that apartment was food.

"Prosecutor: Isn't it true that you broke into two apartments at that address?

"Defendant: Yes. It was the third floor and the fourth floor.

"Prosecutor: And is it your testimony that no money was taken from either one of those apartments?

"Defendant: Right.

"Prosecutor: And one of the reasons—Is it true that you broke into those apartments and stole food because you were using money, which normally would go to [purchase] food, to buy cocaine?

"Defendant: No, I wouldn't—I would spend the money that should have been used towards the food on cocaine, but when I had broken into the apartment, that was towards the end of the month. I had no more food stamps left. I did have food in my house, but it was nothing like, it was like canned foods like, say, Spaghettios and stuff like that for my children, my older children. Travis had his formula

that's up in the cabinet, but when I broke into the other apartment, I had stolen meats out of the freezer so I had meats in the house for the children."

At trial, the state sought to play for the jury a tape recording of defendant's grand jury testimony, including the portion excerpted above. The defendant objected inter alia, to the admission of evidence pertaining to (1) the cocaine found in Travis's system at birth, (2) defendant's cocaine use during her pregnancy, (3) defendant's use of her AFDC money to purchase cocaine, and (4) defendant's shoplifting and breaking into apartments. Each of these objections was overruled, and these portions of defendant's grand jury testimony were played for the jury at trial.[3] The defendant claims that the admission of evidence of other crimes that she had committed which were unrelated to the crime for which she was standing trial was reversible error. We disagree with both defendant's characterization of these other crimes as "unrelated" and with her contention that the admission of evidence of their commission was reversible error.

 Generally, evidence that shows or tends to indicate that an accused has committed another crime independent of the crime for which he or she is standing trial is irrelevant and inadmissible. *State v. Chartier*, 619 A.2d 1119, 1122 (R.I.1993); *State v. Cardoza*, 465 A.2d 200, 202 (R.I.1983); *State v. Colvin*, 425 A.2d 508, 511 (R.I.1981). "This rule operates to prevent a jury from finding a defendant guilty based upon unrelated crimes rather than upon evidence [relating] to the charged offense." *Cardoza*, 465 A.2d at 202. There are, however, several well-established exceptions to this rule. Evidence that a defendant has participated in or committed prior crimes may be admissible if such evidence "tends to establish the defendant's 'guilty knowledge, intent, motive, design, plan, scheme, system, or the like' with respect to the offense charged." *State v. Gallagher*, 654 A.2d 1206, 1210 (R.I.1995); *State v. Lemon*, 497 A.2d 713, 720 (R.I.1985); *State v. Colangelo*, 55 R.I. 170, 174, 179 A. 147, 149 (1935); *see also* R.I. R.Evid. 404(b).

---

**3.** The trial justice did sustain a defense objection to any reference being made to an armed robbery committed by defendant and Young after Travis had died.

We have previously stated that in situations in which the prior crimes "are interwoven with the offense for which the defendant is being tried, or directly support a finding of guilty knowledge in the perpetration of that offense," then evidence of the prior crimes is admissible. *Cardoza*, 465 A.2d at 202 (quoting *Colangelo*, 55 R.I. at 174, 179 A. at 149). Stated another way, evidence of prior crimes is not admissible to prove the propensity of a defendant to commit such a crime but it is admissible to show a fact or facts which tend to prove that the defendant is guilty of the crime charged. *Lemon*, 497 A.2d at 720.

In the instant case, during the period in question, defendant's addiction to and obsession with cocaine were the overriding factors that controlled virtually every aspect of her life. She spent nearly all her money, including the money from her AFDC checks, to buy cocaine. Because she used her money from public assistance to purchase cocaine rather than food, defendant resorted to breaking into apartments to steal food for her children. She shoplifted so that she could trade the stolen merchandise for cocaine. All defendant's criminal activity was inextricably linked to her cocaine addiction and her compulsion to have cocaine at any cost.

■ The defendant claims, and the state concurs, that defendant did not intentionally deprive Travis of food and care. Rather, both defendant and the state contend that because defendant was so intoxicated from her use of cocaine during the period surrounding Travis's death, she was physically and mentally unable to care for her infant child properly. It was this very addiction and compulsion that resulted in defendant being incapable of providing the necessary care and supervision that ultimately led to Travis's death. Evidence of defendant's shoplifting and breaking into apartments and the relation that this criminal activity bore to her compulsion to obtain cocaine are relevant to the issue of whether defendant possessed the requisite intent to commit the crime of wrongfully permitting her son to be a habitual sufferer. In the circumstances of this case, defendant's shoplifting and breaking into apartments were interwoven with the offense for which she was being tried and

evidence of these prior crimes was therefore properly admissible. *See Cardoza, supra.* The trial justice was correct in allowing evidence of these prior crimes.

## IV

### THE FAILURE TO GIVE A LIMITING INSTRUCTION

The defendant contends that even if evidence of prior criminal acts was admissible, the trial justice's failure to instruct the jury concerning the limited purpose for which such evidence could be used constituted reversible error. The defendant, citing *State v. Jalette*, 119 R.I. 614, 625, 382 A.2d 526, 532 (1978), claims that when evidence of other crimes is admissible, the trial justice must specifically instruct the jury concerning the limited purpose for which such evidence was introduced. She further contends that *State v. Brown*, 626 A.2d 228, 234 n. 2 (R.I.1993), mandates that a trial justice is required to give a limiting instruction even in the absence of counsel's request for such instruction.

■ The two cases cited by defendant both involved sexual-assault charges and evidence of prior sexual misconduct. The *Jalette* rule applies only when a defendant is charged with a sexual offense and evidence of prior sexual misconduct is admitted. The *Brown* case stands for the proposition that when a defendant is charged with a sexual offense, a trial justice should offer a limiting instruction sua sponte when admitting evidence of other sexual acts. Because the case at bar involved neither a sexual-assault charge nor evidence of prior sexual offenses, the trial justice was not required to give a limiting instruction in the absence of a request for such an instruction by defense counsel. *See State v. Martinez*, 651 A.2d 1189, 1195 (R.I.1994). The trial justice therefore committed no error by failing to give a limiting instruction.

## V

### THE TESTIMONY CONCERNING EVENTS THAT OCCURRED FOLLOWING TRAVIS'S DEATH

Two or three days after the cocaine binge had ended, defendant went to McMasters's

apartment and informed her that Travis had died that morning. The defendant was carrying a bag containing cans of baby formula and asked McMasters if she knew where she (defendant) could exchange the unused formula for cocaine. McMasters told defendant that she did not know where the formula could be exchanged for cocaine but suggested that she take it to a local supermarket to get a cash refund. McMasters then accompanied defendant to a supermarket in Pawtucket where they attempted to return the formula for cash. They were unsuccessful in this attempt, however, because they did not have a receipt for the formula and store policy dictated that no cash refunds be given for returns without a receipt for the merchandise. The defendant told the assistant store manager that her baby had just died, and the manager gave defendant $20 out of his own pocket because he felt sorry for her.[4] The defendant used this $20 to purchase cocaine. The defendant and McMasters then went to McMasters's apartment and smoked cocaine. McMasters was permitted to testify to this incident over defense objection that such evidence violated Rule 404(b) of the Rhode Island Rules of Evidence concerning bad character.

The next day, the day after Travis died, defendant went to McMasters's apartment building, apparently angry at McMasters because defendant thought that McMasters owed her money. The defendant began screaming obscenities from the driveway of McMasters's apartment building toward the window of McMasters's apartment. McMasters opened her window and told defendant to quiet down, but defendant proceeded to the porch of McMasters's apartment. The defendant began banging on the door and then smashed the apartment window with the handle of a butcher knife. Defense counsel objected to any testimony concerning presentation of this incident to the jury at trial on grounds that such evidence was irrelevant, prejudicial, and violative of Rule 404(b). The objection was overruled. Thereafter the grand jury tape wherein the prosecutor questioned defendant concerning this incident was played for the jury, and McMasters also testified concerning the episode.

The defendant claims that evidence concerning these two occurrences is completely irrelevant and highly prejudicial and does not fall under any of the exceptions to Rule 404(b) concerning admissibility of evidence of other crimes, wrongs, or acts. The trial justice admitted such evidence, finding it relevant insofar as it related to defendant's intent, knowledge, and identity. She also found that there was no danger of unfair prejudice resulting from the admission of this evidence.

Although we may not agree that there was *no* danger of prejudice resulting from the admission of evidence relating to the two incidents that occurred following Travis's death, we do not feel that the admission of such evidence was error. As we stated in *Lemon,* "[A]ll of the evidence that tends to prove that [a] defendant is guilty of a crime might be said to be prejudicial. Said evidence is inadmissible only if it is prejudicial and irrelevant." 497 A.2d at 720.

 "[T]he admission or exclusion of evidence on grounds of relevancy is within the discretion of the trial justice." *State v. Neri,* 593 A.2d 953, 956 (R.I.1991). Absent a showing of abuse of discretion this court will not overturn the trial justice's ruling on the admissibility of evidence. In the instant case, evidence of defendant's attempt to return unused baby formula after the death of her son and of her subsequently spending the $20 given her by the store manager to purchase cocaine tended to show the ruthless determination on the part of defendant to obtain cocaine in any circumstances. This determination was probative of her intent to permit her son to be a habitual sufferer for want of the food and proper care that was essential for his survival. Evidence of the incident outside McMasters's apartment on the day following Travis's death would be of limited relevance, but its admission would not constitute an abuse of discretion. In light of the totality of evidence in the case such

---

4. This testimony was corroborated by the manager of the supermarket who gave defendant the $20.

admission would not be prejudicial or reversible error. We are of the opinion that the trial justice did not abuse her discretion in admitting evidence of these two incidents.

## VI

### THE DENIAL OF DEFENDANT'S MOTION FOR MISTRIAL

In response to a question from the prosecutor concerning whether there was a period during which she continued to purchase cocaine with defendant and Young, McMasters responded, "[Y]eah. We bought, we purchased cocaine until all our money ran out of our checks, and then me and Eddie went and robbed somebody for some more money." Defense counsel immediately moved at sidebar for a mistrial on the ground that robbery is a very serious crime and the fact that McMasters and Young had committed a robbery was imparted to the jury was extremely prejudicial to defendant. The motion for mistrial was denied, but the trial justice immediately struck the statement concerning the robbery from the record and instructed the jury to ignore it. In denying the motion for mistrial, the trial justice noted that defendant had not been implicated in the robbery. McMasters testified that only she herself and Eddie (Young) had committed the robbery. The trial justice found that defendant suffered no harm from the statement concerning the robbery. The defendant claims that the trial justice's denial of the motion for mistrial was prejudicial error.

The defendant relies on our recent opinion in *State v. Gallagher,* to support her claim that she was unfairly and substantially prejudiced by the reference to the robbery committed by McMasters and Young. In that case, we held that testimony that implicated the defendant's friends in a shooting which was unrelated to the charges for which the defendant was standing trial was extremely prejudicial and constituted reversible error. In *Gallagher,* however, the "credibility of the witnesses was the paramount issue at trial." 654 A.2d at 1211. The testimony at issue in *Gallagher* implicated a defense witness in a shooting that was unrelated to the charges for which the defendant was standing trial.

In that case the defendant was prejudiced by the admission of the evidence since it seriously impaired the credibility of the defense witness in a case where the credibility of witnesses was the most important issue. *Id.*

In the case at bar, the principal facts testified to by McMasters are virtually uncontradicted. McMasters's credibility was not a primary issue. Furthermore, McMasters was a prosecution witness, not a defense witness. If the jury had questioned McMasters's credibility, this would have benefited defendant, not prejudiced her. Young did not testify in this case; thus his credibility is not in issue. The defendant's reliance on *Gallagher* is therefore misplaced.

 It is within the sound discretion of the trial justice to grant or to deny a defendant's motion to pass a case (motion for mistrial). *State v. Mastrofine,* 551 A.2d 1174, 1177 (R.I.1988). The denial of a motion to pass the case is to be accorded great weight and will not be overturned on appeal unless clearly wrong. *Id.* In the case at bar the statement concerning the robbery did not implicate defendant. The trial justice also admonished the jury to disregard the statement. The trial justice committed no error in denying defendant's motion for mistrial.

## VII

### THE STATE'S REBUTTAL TESTIMONY

Both the state and defendant presented expert witnesses who testified concerning the cause of Travis's death. In pretrial discovery the state disclosed to the defense the reports and anticipated testimony of four medical experts: Dr. William Quentin Sturner, Dr. Penelope Dennehy, Dr. Donald Singer, and Dr. Joel Adelson. In its case in chief the state called only two of the expert witnesses—Doctors Sturner and Dennehy.

Doctor Sturner, who performed the autopsy on Travis, testified that in his opinion, the cause of Travis's death was malnutrition and dehydration that were due to starvation and neglect. He testified at length concerning his various findings that supported this conclusion and how these same findings did not

support a conclusion that the cause of death was a gastrointestinal illness.

The thrust of Dr. Dennehy's testimony was to discredit the defense's theory that Travis had died as a result of viral gastroenteritis. She did testify, however, that in her opinion the cause of death was dehydration due to deficient input.

The defense also presented two expert medical witnesses, Dr. William Durbin and Dr. David Gang. Both defense experts concurred with the prosecution experts that Travis had died as a result of dehydration. Doctors Durbin and Gang, however, believed that the cause of the dehydration was a gastrointestinal virus that manifested itself in an overwhelming expulsion of fluid from the baby's body.

The state presented Doctors Singer and Adelson as rebuttal witnesses. Doctor Singer testified that in preparation for testifying he had reviewed the autopsy report, photographs, Travis's birth and neonatal health records, the reports prepared by the defense's expert witnesses, and tissue slides prepared "from virtually every organ in the body." The prosecutor then asked the doctor if he had an opinion concerning whether Travis had been malnourished. Defense counsel's objection to this question was overruled. After Dr. Singer responded that in his opinion Travis had been malnourished, the prosecutor asked the doctor if he had an opinion concerning the degree of malnutrition. Defense counsel again objected on the ground that such testimony was not proper rebuttal. This objection was overruled, and defense counsel then requested and was granted a continuing objection to that line of testimony.

In addition to stating his opinion concerning the cause of death, Dr. Singer disputed certain of the claims made by the defense's expert witnesses. For example, Dr. Singer disagreed with Dr. Durbin's assertion that Travis had been growing at a consistent rate. He also disagreed with Dr. Durbin's and Dr. Gang's characterization of the fecal material in Travis's diaper and with their contention that microscopic changes in the intestines following death would have made it extremely difficult to detect inflammation. In the

course of his testimony, Dr. Singer also expressed opinions on some of the same matters to which Dr. Sturner had testified in the state's direct case and reached similar conclusions to those of Dr. Sturner.

Doctor Adelson was the state's second expert rebuttal witness. He testified that in his opinion the dehydration that caused Travis's death was the result of insufficient intake rather than excessive output. Defense counsel again requested and was granted a continuing objection to this line of testimony on the ground that it was improper rebuttal. Doctor Adelson then explained the reasons why he had concluded that Travis had not suffered a gastrointestinal disorder. Many of these reasons were the same as those testified to by Dr. Dennehy in the state's direct case.

The defendant claims that the testimony of Doctors Singer and Adelson was improper rebuttal because the bulk of the testimony was cumulative. She further contends that some of the testimony pertained to new matters and was therefore improperly presented for the first time in the state's rebuttal case. We shall address the second prong of this argument first.

■ The defendant points to only two examples of new evidence being presented for the first time on rebuttal. When Dr. Singer was relating why he disagreed with Dr. Durbin's assertion that Travis had grown at a consistent rate, he explained that the growth charts relied upon by Dr. Durbin contained outdated information whereas the growth tables that he used were, to his knowledge, the most accurate and up-to-date tables of the kind. Although Dr. Singer's testimony concerning the accuracy of information contained in the growth charts and tables utilized by the expert witnesses may indeed have been new evidence imparted to the jury for the first time on rebuttal, this information was offered for the sole purpose of explaining how he had come to a conclusion contrary to that of the defense's expert witness. There was no error in the admission of this testimony.

The only other example defendant points to of the presentation of new evidence for the

first time on rebuttal is Dr. Adelson's testimony that the degree of Travis's malnutrition may have been mild to moderate. We see no error in the admission of this testimony. The state was not presenting a new theory for the cause of Travis's death. To the contrary, each of the state's four expert witnesses testified that the cause of death was dehydration resulting from insufficient input, that is to say, due to malnutrition.

■ Returning to the first prong of defendant's argument, she claims that the testimony of Doctors Singer and Adelson was improper rebuttal because it was for the most part cumulative. We note that "the proper function and purpose of rebuttal testimony is to explain, repel, counteract, or disprove the evidence of the adverse party." *State v. Donovan*, 120 N.H. 603, 607, 419 A.2d 1102, 1105 (1980) (quoting *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974)). The decision to permit rebuttal testimony lies in the discretion of the trial justice, whose decision will not be overturned absent an abuse of that discretion. *See State v. Simpson*, 520 A.2d 1281, 1284 (R.I.1987); *State v. Lawrence*, 492 A.2d 147, 149 (R.I. 1985); 2 *Wharton's Criminal Evidence* § 432 (14th Torcia ed. 1986).

■ Doctor Singer's and Dr. Adelson's testimony was designed to discredit the defense's theory that Travis died as a result of dehydration caused by a gastrointestinal infection. Because of the nature of the medical evidence, it was virtually impossible for the doctors' rebuttal testimony not to repeat certain, or even much, of the testimony that was presented during the state's case in chief. We are of the opinion that the trial justice did not abuse her discretion in admitting this rebuttal testimony.[5]

## VIII

### THE DENIAL OF DEFENDANT'S REQUEST FOR SURREBUTTAL

Following the state's presentation of Doctors Singer and Adelson as rebuttal witnesses, defense counsel made an equivocal request for surrebuttal. Defense counsel based his request on two grounds. First, counsel argued that it was unfair for the state to present its case last in a manner that defense counsel claimed was improper rebuttal. Second, counsel contended that the state had improperly presented a new theory in its rebuttal case concerning the cause of Travis's death, to which the defense should have the opportunity to respond. In response to the trial justice's inquiry concerning what testimony he wanted to rebut, defense counsel mentioned Dr. Adelson's theory of the cause of death and related matters. He then continued: "There may well be other things, your Honor. I need time to think about it and talk about it with Dr. Gang and Dr. Durbin. I don't really know that after talking with them, we would consider it [to] be worthwhile to put on a surrebuttal case." Prior to ruling on the request, the trial justice stated that she was "unable to see any even mildly significant reason to grant surrebuttal, which is not commonly done, in any event," but planned to hold off on her decision until the following morning. Because of the difficulty of arranging for his expert witnesses to be present the following morning when the likelihood was great that the request for surrebuttal would be denied, defense counsel requested that the trial justice make an immediate ruling. The trial justice obliged and denied the request.

In *State v. Byrnes*, 433 A.2d 658 (R.I.1981), we quoted with approval the Illinois Appellate Court in *Ross v. Danter Associates, Inc.*, 102 Ill.App.2d 354, 242 N.E.2d 330 (1968), for the standard for permitting surrebuttal testimony:

"The purpose of surrebuttal is to permit the defendant to introduce evidence in refutation or opposition to new matters interjected into the trial by the plaintiff on rebuttal. * * * In other words, fairness requires that the defendant be permitted to oppose new matters presented by plaintiff for the first time which the defendant *could not have presented or opposed at the time of presentation of his main case.* Contrariwise, the purpose of surrebuttal is

---

5. We conclude that the two Louisiana cases cited in defendant's brief, *State v. Bagwell*, 519 So.2d 875 (La.Ct.App.1988), and *State v. Dayton*, 445 So.2d 76 (La.Ct.App.1984), are inapposite to the facts of this case.

not the introduction of evidence merely cumulative to that presented by the defendant in its original presentation. * * * *It follows that the defendant has no right to present surrebuttal evidence merely because the plaintiff has presented rebuttal evidence.* Byrnes, 433 A.2d at 669–70 (quoting Ross, 102 Ill.App.2d at 367–68, 242 N.E.2d at 336–37).

██ Even if we agreed with defendant's arguments that the state's rebuttal testimony was improper, which we do not, we would still be constrained to find that the trial justice committed no error in denying the request for surrebuttal. The request for surrebuttal was equivocal, and defense counsel was unable to apprise the trial justice with any degree of certainty regarding what testimony he intended to rebut. More importantly, counsel did not apprise the trial justice concerning the proposed content of the surrebuttal testimony. Without any knowledge regarding the content of the proposed surrebuttal testimony, the trial justice was unable to determine whether it met the standards for the admission of such testimony which are quoted above. We realize that the trial justice did not inquire of counsel concerning the content of the proposed surrebuttal testimony, but such an inquiry would have proved futile inasmuch as counsel had not yet conferred with his expert medical witnesses and therefore would have been unable to inform the court concerning the content of any testimony that they might have offered.

Moreover, the denial of the request for surrebuttal was proper because of the equivocal nature of the request. In one breath defense counsel stated that he needed time to think about it and to talk about it with his expert witnesses and in the next breath he asked the trial justice for an immediate ruling on the request. In view of the fact that counsel was not even sure if he intended to put on a surrebuttal case, the trial justice committed no error in denying the request.

## IX

## THE DENIAL OF DEFENDANT'S PROPOSED JURY INSTRUCTION

Defense counsel submitted the following proposed jury instruction to the trial justice:

"If you find that Travis Young suffered from want of food and proper care as a result of unknowing oversight due to any cause, including the inability of the defendant to remember to feed and care for him, you must find her not guilty on counts one and two."

The trial justice declined to give this proposed instruction. Instead, she instructed the jury that in order to find defendant guilty of second-degree murder, it must find that five elements were proved beyond a reasonable doubt, specifically that (1) defendant had custody or control of Travis and that Travis was a child under eighteen years of age, (2) Travis was a habitual sufferer for want of food or proper care, (3) defendant wrongfully caused or permitted Travis to be a habitual sufferer, (4) the crime of wrongfully causing or permitting a child to be a habitual sufferer for want of food or proper care is inherently dangerous to human life, and (5) defendant knew or was aware beforehand that there was a likelihood that Travis's life would be endangered as a result of causing or permitting him to be a habitual sufferer for want of food or proper care. The trial justice explained certain of these elements in further detail, such as the meanings of "habitual," "wrongfully," and "inherently dangerous to human life."

The defendant claims that the trial justice's failure to give the proposed instruction quoted above, or one of similar import, is reversible error. She claims that it was incumbent upon the trial justice to instruct the jury that in order to find her guilty of second-degree murder and of wrongfully permitting a child to be a habitual sufferer, it must find that she intentionally caused or permitted her son to be a habitual sufferer.

██ Initially we note that the child-neglect statute, § 11–9–5, may be violated by a failure to act on the part of one who has a duty to act, namely, a person who has custody or control of a child under the age of eighteen. Section 11–9–5 reads in pertinent part:

"Cruelty to or neglect of child.—Every person having the custody or control of

any child under the age of eighteen (18) years * * * who shall wrongfully cause or permit that child to be an habitual sufferer for want of food * * * [or] proper care * * * shall be guilty of a felony."

Thus the statute may be violated by an omission to act as well as by active conduct. The culpability element contained in the statute is "wrongfully." In her jury charge, the trial justice defined "wrongfully" as something done without legal justification and without legal excuse. We concur with this definition. By imposing criminal liability for wrongful conduct rather than for intentional conduct, our Legislature evinced an intent that the child-neglect statute could be violated even absent a conscious purpose to cause or permit a child to be a habitual sufferer, as long as no legal justification or legal excuse existed for so causing or permitting the child to be a habitual sufferer. Thus § 11–9–5 can be violated by an unintentional omission to act, contrary to the contention of defendant.[6]

▬▬▬ Even though one can therefore be guilty of wrongfully permitting a child to be a habitual sufferer upon the basis of an unintentional omission to act, in order for the crime of wrongfully permitting a child to be a habitual sufferer to serve as a predicate felony to a charge of second-degree felony murder, the accused must have had the intent to commit the underlying felony. *See State v. Villani*, 491 A.2d at 980, 2 *Wharton's Criminal Law* § 147. Although it is true that the trial justice did not specifically instruct the jury that in order to find defendant guilty of second-degree murder, it must find as one of the elements of the crime that she intentionally caused or permitted her son to be a habitual sufferer for want of food or proper care, we believe that the instructions given were substantially equivalent. The trial justice instructed the jury that it must find that defendant wrongfully, that is, without legal justification or without legal excuse, caused or permitted Travis to be a habitual sufferer. She also instructed that it must find that

defendant knew or was aware beforehand that there was a likelihood that Travis's life would be endangered as a result of permitting or causing him to be a habitual sufferer for want of food or proper care. We believe that these two instructions in combination, requiring that the jury find that defendant had no legal justification or no legal excuse for causing her son to be a habitual sufferer and also requiring that the jury find that defendant knew or was aware beforehand that causing or permitting her son to be a habitual sufferer for want of food or proper care was likely to endanger his life, were the functional equivalent to an instruction requiring the jury to find that defendant intentionally caused or permitted her son to be a habitual sufferer. "This failure to distinguish between intent * * * and knowledge is probably of little consequence in many areas of the law, as often there is good reason for imposing liability whether the defendant desired or merely knew of the practical certainty of the results." LaFave and Scott, *Substantive Criminal Law,* § 3.5(b) at 305 (1986); *see also* Model Penal Code § 2.02 cmt. 2 at 234 (1985) (the "distinction [between acting purposely and knowingly] is inconsequential for most purposes of liability; acting knowingly is ordinarily sufficient").

The trial justice committed no error in refusing to give the requested instruction.

For the foregoing reasons the defendant's appeal is denied and dismissed, and the judgment of conviction is affirmed. The papers in the case may be remanded to the Superior Court.

BOURCIER, J., did not participate.

---

6. In the case at bar, however, we find that the evidence is sufficient to find that defendant intentionally permitted her son to be a habitual sufferer. *See* part II B, *supra.*