Filed 7/16/21  P. v. Tyler CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GEORGE TYLER,<br><br>    Defendant and Appellant. | F081652<br><br>(Kern Super. Ct. No. BF116022A)<br><br><br>**OPINION** |

### THE COURT*

APPEAL from an order of the Superior Court of Kern County.  David R. Lampe, Judge.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

* Before Levy, Acting P.J., Franson, J. and De Santos, J.

## INTRODUCTION

In 2009, appellant and defendant George Tyler (Tyler) was convicted of murdering his girlfriend's five-year-old son, D.W., and sentenced to 25 years to life. Tyler's mother, codefendant Mavis Watson (Watson), was convicted of being an accessory after the fact. This court affirmed their convictions on appeal.

In 2020, Tyler filed a petition for recall and resentencing pursuant to Penal Code[1] section 1170.95 and claimed his murder conviction should be reversed because he was not the actual killer. The trial court denied the petition for recall.

In his appeal from the court's denial of the petition, Tyler's appellate counsel has filed a brief that summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).) Thereafter, defendant filed a letter brief and raised several issues. We affirm.

## FACTS[2]

In August 2006, Tyler had been living with his girlfriend, Dionna, in her house in Rosamond for about two years. They lived with four children – their baby and Dionna's

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] As will be discussed below, Tyler's petition for recall asserted that he was not the actual killer of D.W. The prosecution filed an opposition to his petition with a lengthy recitation of the facts that were "taken directly from the opinion regarding [Tyler's] appeal," referring to this court's nonpublished opinion in Tyler's first appeal. In the *Wende* brief filed in this case, Tyler's appellate counsel asserted the prosecution's factual summary "does not accurately trace the statement of facts in this Court's opinion in case no. F058478." In his letter brief, Tyler challenged the prosecution's factual statement and repeatedly claimed there was no evidence that he was the actual killer.

Given this background, we take judicial notice of the appellate record and this court's nonpublished opinion in *People v. Tyler* (F058478, Oct. 27, 2010) 2010 WL 4227797. The following factual statement is quoted from this court's opinion in its entirety. (Evid. Code, § 450, § 452, subd. (d), § 459; *In re W.R.* (2018) 22 Cal.App.5th 284, 286–287, fn. 2.)

2.

three other children, five-year-old D.W., four-year-old K.W., and three-year-old Ke.W. Tyler's mother, Watson, lived about 30 minutes away.

Tyler was prohibited by a court order from being in the same home as the children, but Dionna knowingly violated the order. She lied to the social workers and told them that Tyler did not live with her and the children, and she told the children to lie also. She had witnessed Tyler hit the children, but she had not reported it to the authorities.

On the evening of August 10, 2006, Tyler's friends, Terrance and Derrick, came over to the house to play dominoes and drink beer. While the three men were playing, five-year-old D.W. came into the room and talked to Tyler about tying his shoes. Tyler asked D.W. who had taught him how to tie his shoes, and D.W. responded that his mother had taught him. Tyler grabbed D.W. by his shirt, pulled him close, and asked him the same question two more times. Tyler did not like D.W.'s answer, so he slapped him. Dionna was standing nearby. Terrance told Tyler to leave D.W. alone because he did not really understand what Tyler was talking about. Terrance and Derrick tried to tell Tyler how to explain things to children. Tyler pushed D.W. away, and both D.W. and Dionna left the room.

About 20 minutes later, Dionna left the house, leaving all the children alone with the three men. A short time later, Terrance and Derrick left as well.

Dionna went to pick up her cousin, Kenna, who was going to help care for the children over the weekend. When they stopped at Dionna's father's house, Dionna and Tyler spoke on the telephone. Tyler told her to "hurry up and get [her] ass back here" because D.W. had said, "F[**]k you" to him, and he was "so sick of this shit." Dionna hung up and told Kenna they had to go. She said, "Oh, my God, he's about to beat my [....]"

Four-year-old K.W. was in the boys' room, which was next to the master bedroom, because Tyler told her to get into D.W.'s bed. From there, she could hear from the master bedroom D.W. screaming, "Mommy," and Tyler asking him, "Who taught you

3.

how to tie your shoes?" K.W. also heard "[w]hooping sounds, like slapping sounds" and a whipping sound from a weightlifting belt.

About 20 minutes after Dionna called Tyler, she and Kenna arrived back at the house. Dionna knocked on the door because she did not have her house keys. Tyler asked, "Who is it?" and opened the door when Dionna replied.

Tyler stood at the door in wet, blue boxer shorts. He was holding D.W. over his shoulder with his left arm. D.W. was naked, limp, and motionless. His eyes were rolled back in his head and blood was coming out of his mouth. His bottom teeth had been knocked out and he was covered in bruises. Dionna thought he was dead, and she started screaming, "My baby."

Tyler grabbed Dionna and took her to the master bedroom. The shower was running in the master bathroom and the floor was wet. The other children were in the boys' room, and the baby was screaming on the bed in the master bedroom. Tyler told Dionna that he "whooped" D.W. with his weightlifting belt because D.W. would not stay still. Tyler pointed to the bloody weightlifting belt on the bedroom floor. The belt was four or five inches wide and had a big buckle. Tyler's clothes and bloody shoes were also on the bedroom floor. Tyler repeatedly told Dionna he did not mean to do it, and he was going to kill himself.

D.W. jerked and Dionna realized he was not dead. She grabbed him and patted his arms. She ran to the front of the house and picked up the telephone to call the police, but Tyler came up behind her, stood with his body against hers, and asked what she was doing. Dionna was afraid Tyler was going to beat her, as he had done more than 100 times in the past. Dionna explained she was just going to call Watson. Dionna pleaded with Tyler to let her call Watson because they needed some help. Dionna called Watson and screamed that Tyler had killed D.W. and she needed Watson to come help her. Tyler screamed that he did not kill D.W. When Dionna said that D.W. was going to die, Watson said she was on her way.

4.

Kenna repeatedly told Tyler and Dionna they needed to take D.W. to the hospital, but Tyler said he would go to jail, and Dionna said her children would be taken away. Dionna said D.W. was going to be okay.

Dionna and Kenna put all the children in the car to go get help. Tyler came out and told Dionna to get in the car. Kenna thought they were going to the hospital, but, to her surprise, Tyler turned the opposite direction and drove them to Watson's house. Dionna was talking to someone on a cell phone, saying, "He done killed my baby." On the way, they met Watson's car and both cars pulled over. Watson moved Dionna and D.W. to her car. Watson asked Tyler, "Boy, what have you done?" Watson told Kenna, "You ain't seen nothing, and you don't know nothing." Kenna took the statement as a threat. Watson then drove Dionna and D.W. to Watson's house.

Tyler drove Kenna and the remaining children to the house of his sister, Tiffinay. On the way, he explained to Kenna that he "didn't mean to do it [.]" He said, "[T]he reason why I kept whooping [D.W.] is because [I] told him to stand up, and he wouldn't stand up." Tyler said he was going to kill himself and he needed to get his gun. After Tyler picked up Tiffinay and her boyfriend, he started to tell them what happened, but the boyfriend told Tyler to wait until Kenna got out of the car. Tyler drove to Watson's house.

At Watson's house, Watson took Dionna and D.W. to her bedroom. D.W. lay on the bed unconscious. He was black and blue, and he had several knots on his head. His mouth was swollen and would not shut. Tiffinay's boyfriend put ice on D.W.'s head. D.W.'s breathing had slowed and Dionna told Watson they needed to go to the hospital, but Watson just screamed at her and called her a "stupid bitch." Watson took all the telephones in the house, including Kenna's cell phone, and said, "[A]in't nobody using [my] goddam [*sic*] phones." Kenna, who was in another room with the children, could hear D.W.'s labored breathing. She could hear Dionna crying and Watson telling her to shut up.

5.

That night, D.W. slept with Watson on Watson's bed. Dionna watched D.W. through the night. The next morning, Dionna saw him stop breathing. She said to Tiffinay, "You['ve] got to save my baby. He's dead." Watson told Tiffinay to take Dionna and D.W. to the local clinic because "there wasn't no f[**]king ambulance coming out to her house." Dionna believed Watson sent Tiffinay with her to watch her.

After they left, Watson entered the room where Kenna was with the children and told Kenna, "You better not say nothing," and "You don't know nothing." Watson repeated this to her throughout the day. When they were in the kitchen, Watson made these statements to Kenna while standing next to a gun that was on the counter. Kenna perceived the presence of the gun as a threat. Kenna knew that Watson and her family were very violent people who were involved with drugs and had used guns in a violent way in the past. Kenna thought they might kill her when the whole thing was over. At some point, Watson took the baby, then put Kenna, K.W., and Ke.W. in another bedroom that had a deadbolt and locked the door for a few hours.

From the clinic, D.W. was airlifted to a children's hospital in Hollywood, where he remained on life support for hours until he died. At both the clinic and the hospital, Dionna claimed that D.W. was injured when she ran over him with a car, but the medical personnel did not think the injuries were consistent with her explanation. Dionna did not tell the truth because the rest of her children were still at Watson's house, and she knew there was a gun at the house. Dionna felt her children were being held hostage and she was afraid Watson or Tyler would kill them.

Meanwhile, Watson took Kenna, K.W., and Ke.W. to Dionna's house. On the way, Watson stopped in Saddleback and conducted a drug deal. At Dionna's house, Watson parked on the street, got out, and told the rest to stay in the car. But after about five minutes, Ke.W. told Kenna he had to use the bathroom, so she took him into the house. Kenna saw Watson cleaning the front bathroom where D.W.'s teeth were on the counter. She was cleaning the bathtub and wiping off the counter. She told Ke.W. to use

the toilet, then told them to get out and get back in the car. Ten or 15 minutes later, Watson came out of the house carrying the weightlifting belt, the shoes and boxer shorts Tyler had been wearing the previous night, the clothes D.W. had been wearing the previous night, and a bag of papers. As they drove back to Watson's house, Watson gradually threw these items out of the car into the desert. When they got to Watson's house, Watson told Kenna to sit there and again warned her not to say anything. Because Watson had taken all the telephones, Kenna could not call anyone.

After about one and one-half hours, a social worker knocked on the door and stated she was taking the children into protective custody. Watson gave her K.W. and Ke.W. but told her the baby was not there. The social worker returned five minutes later with a police officer and demanded the baby. Watson left the house and returned with the baby. When the police were present, Kenna asked Watson if she could leave, and she let her go.

Blood was later found on the cabinets and in the shower of the master bathroom and on the wall and door between the master bathroom and master bedroom. The doors to the master bedroom and the front bathroom were damaged, the wall near the door to D.W.'s room was dented, and the wall in the den had two holes in it. According to Dionna, the blood and damage were not present before the night that Tyler beat D.W.

An autopsy revealed D.W.'s extensive injuries. He had contusions, abrasions, and bruises all over his head and face. He had multiple linear bruises extending down the side of his face, caused by a linear object, such as a belt, and he had abrasions on his chest and back. He had suffered internal bleeding in his head, brain, chest, back, colon, arms, and legs. His injuries were not consistent with having been run over by a vehicle. His painful death – ruled a homicide – was caused by complications, such as brain swelling and organ failure, resulting from blunt force trauma.

Law enforcement arranged a recorded telephone conversation between Dionna and Tyler. In it, Tyler stated that he did not know if he should kill himself. He asked Dionna,

7.

"[I]s there a way you can tell ['em] you know something else?" He suggested that she could say her cousin, Deshon, did it. Tyler referred to D.W.'s death as an accident.

In an August 31, 2006, interview with law enforcement, Watson claimed that Dionna had been smoking marijuana and may have been driving under the influence when she hit D.W. with her car. Watson claimed that D.W. seemed normal when Dionna brought him to Watson's house, but D.W. told her that night that he had been hit by a car. Watson, who ran a day care business, said she would be able to recognize a hurt child, and she did not notice any bruises on D.W. She said she went to Dionna's house that day to get clothes and food for the children. She had not seen Tyler since they had all gone to Bakersfield before D.W.'s death.

**Tyler's defense**

The social worker who came to Watson's house to pick up the children did not see a weapon in the house. Kenna did not say anything to her other than that her aunt was a social worker.

An officer testified that he spoke to Dionna on August 10, 2006, to investigate a mark found on Ke.W.'s body in June 2006. Dionna took responsibility for the mark, explaining she had spanked Ke.W. She assured the officer that Tyler was not living in her home. The following day, the officer heard what had happened to D.W. He sent officers to the hospital, but Dionna left when they arrived.

When the officer spoke to K.W. on August 11, 2006, she said Tyler had never struck her, but Dionna had whipped her the previous day. She appeared to mean she had spanked her with a belt. She said Tyler had not whipped D.W. until this occasion and had done so because he would not lie down and take a nap. She did not mention tying shoes.

On cross-examination, the officer testified that Kenna told him Watson and her family had a very violent history, and she was afraid of them. Watson was involved in

drug sales, buying and selling stolen guns, check fraud, and welfare fraud. Kenna tried to distance herself from the family, and she felt threatened and intimidated as a witness.

The officer interviewed Dionna on August 12, 2006. She told him that she called Tyler when she was out on August 10, 2006, because she was afraid that he would be mad that she had been gone too long. He told her that he had to whip D.W. because he said, "F[**]k you," but she did not believe it because D.W. was afraid of Tyler, and D.W. would never say that.

K.W. told the deputy that Tyler was mean because he whipped people with a belt, and he had whipped and killed D.W. She said Tyler also whipped Ke.W. the same night, and the deputy found bruises on Ke.W.

At the hospital, Dionna told officers that she ran over D.W. with her car two times as she was backing up to her house.

When Watson's husband, Curtis, went to pick up Tiffinay from the hospital, Dionna came running out after her and got in the car too. Curtis asked Dionna, "You're not going to stay at the hospital?" and she said she did not want to stay there with those people. Curtis thought she was referring to D.W.'s father's relatives. Curtis did not see Tiffinay make any threats to Dionna.

Dionna later told an officer that she fled the hospital because she got scared when she saw officers examining her vehicle. She was afraid the officers would arrest her.

A Los Angeles police officer testified that in February 2004, he was pursuing a suspicious vehicle that refused to stop. The vehicle pulled over, Dionna got out, and the vehicle continued to evade the police. The vehicle stopped in an apartment complex and the driver (Ke.W.'s father) ran but was eventually apprehended. D.W., K.W., and Ke.W. were left inside the vehicle.

Watson's sister-in-law, Chyrel, testified that she had seen Dionna write a bad check and then run out of the grocery store when she was discovered. Chyrel witnessed Dionna striking K.W. with a belt, throw a shoe at her, and call her a bitch. Chyrel's

9.

husband also witnessed Dionna discipline her children inappropriately. Dionna admitted to Chyrel that she had run over D.W. with the car, and that Tyler was not involved, but Chyrel never reported this to the police.

Tyler's ex-girlfriend, Latisha, testified that she and Tyler lived together from 2002 to 2005. She had three young children of her own and they had a child together. Tyler was a good father to all the children, and the children loved him. He did not discipline the children; that was Latisha's job.

Latisha's daughter, Tiaunee, testified that Tyler was good to her and her brothers. He never spanked them.

Latisha's sister, Ariell, testified that Latisha and Tyler had a happy relationship. They lived together and Ariell sometimes stayed with them. Latisha and Tyler had a child together and Latisha also had her own children. Ariell observed that Tyler took care of them well and responsibly. She never saw him physically discipline a child. She said he was not the type of person who would beat a child.

Kenna's high school teacher believed Kenna was dishonest and would lie to cover for her friends. She was loud, obnoxious, and disruptive to the educational process. She had received numerous referrals for bad behavior at school.

## PROCEDURAL BACKGROUND

On March 23, 2007, an information was filed in the Superior Court of Kern County charging defendant Tyler with count 1, second degree murder (§ 187, subd. (a)), and count 2, assault on a child resulting in death (§ 273ab, subd. (a)). In count 3, codefendant Watson was charged with being an accessory after the fact (§ 32).

On July 31, 2009, after a joint jury trial, Tyler was convicted of counts 1 and 2, and Watson was convicted of count 3.

**Sentencing**

On August 28, 2009, the court conducted the sentencing hearing. It stated that having heard the evidence at the jury trial, there was "no lingering doubt in the Court's mind with respect to [Tyler's] guilt."

The court sentenced Tyler to 25 years to life for count 2, assault on a child resulting in death. The court imposed 15 years to life for count 1, second degree murder, and stayed that term pursuant to section 654.

The court sentenced codefendant Watson to the midterm of two years in prison for count 3.

**Defendant's first appeal**

On October 27, 2010, this court filed the nonpublished opinion in the joint appeal from codefendants Tyler and Watson and affirmed their convictions. (*People v. Tyler*, *supra*, 2010 WL 4227797.

We rejected the arguments that the trial court erroneously denied a motion to discharge the jury pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258; the court should have granted a motion to sever the two cases; the autopsy photographs were prejudicial and should have been excluded; and Watson's conduct credits were not correctly calculated.

We remanded the matter for the limited purpose of correcting Tyler's abstract of judgment as to his custody credits and the actual sentence imposed.

On December 20, 2010, the trial court filed the amended and corrected abstract of judgment for Tyler.

**SENATE BILL NO. 1437**

The instant appeal involves Tyler's petition for recall filed pursuant to Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which became effective on January 1, 2019, and "was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is

not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citations.] Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723 (*Martinez*); *People v. Gentile* (2020) 10 Cal.5th 830, 842.)

"Senate Bill 1437 also add[ed] … section 1170.95, which allows those 'convicted of felony murder or murder under a natural and probable consequences theory … [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts ....' [Citation.]" (*Martinez, supra*, 31 Cal.App.5th at p. 723.)

"An offender may file a petition under section 1170.95 where all three of the following conditions are met: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' [Citation.]" (*Martinez, supra*, 31 Cal.App.5th at p. 723.)

"A trial court that receives a petition under section 1170.95 'shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section.' [Citation.]" (*Martinez, supra*, 31 Cal.App.5th at p. 723.)

"If the petitioner has made such a showing, the trial court 'shall issue an order to show cause.' [Citation.] [¶] The trial court must then hold a hearing 'to determine

whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.]" (*Martinez, supra*, 31 Cal.App.5th at p. 723.) "[I]f a hearing is held, '[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] '[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' [Citation.] 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' [Citation.]" (*Id.* at p. 724; *People v. Williams* (2020) 57 Cal.App.5th 652, 659–660.)

## TYLER'S PETITION FOR RECALL

On October 18, 2019, Tyler filed, in pro. per., a petition for recall and resentencing pursuant to section 1170.95. Tyler's petition alleged he was entitled to relief because he was convicted under the felony-murder rule and the natural and probable consequences theory, he was "not the actual killer," he did not act with intent to kill, and he was not a major participant in the underlying felony who acted with reckless indifference.

On October 25, 2019, the trial court appointed counsel to represent Tyler in this matter.

**The prosecution's opposition**

On January 31, 2020, the prosecution filed opposition to Tyler's petition, and argued he failed to make a prima facie case for relief under section 1170.95 because he was the actual killer, his actions were the sole cause of the victim's death, and he was not

13.

convicted under the felony-murder rule because felony child endangerment cannot be the basis for such a conviction, citing *People v. Lee* (1991) 234 Cal.App.3d 1214 (*Lee*).[3]

**Tyler's response**

On May 14, 2020, Tyler's attorney filed a response to the prosecution's opposition, that simply asserted that Tyler "denies being the actual killer."

**The court's denial of the petition**

On August 5, 2020, the court denied Tyler's petition. According to the minute order, the court reviewed the parties' documents and the record of the case and found Tyler "was convicted as the perpetrator in the crime."

On August 21, 2020, Tyler filed a timely notice of appeal from the court's denial of his petition for recall.

## DISCUSSION

As noted above, Tyler's counsel has filed a *Wende* brief with this court. The brief also includes the declaration of appellate counsel indicating that Tyler was advised he could file his own brief with this court. By letter on December 29, 2020, we invited Tyler to submit additional briefing.

On January 7, 2021, Tyler submitted a letter brief and asked this court to address several issues.

**Request for appointment of new appellate counsel**

Tyler requested appointment of a new appellate attorney solely because his current attorney filed the *Wende* brief. The filing of a *Wende* brief by counsel, by itself, does not constitute grounds to remove counsel, and his request is denied. (*Wende, supra*, 25 Cal.3d at p. 442.)

---

[3] In *Lee,* this court held that felony child endangerment could not serve as the basis for a felony-murder conviction because the offense was not inherently dangerous to life. (*Lee, supra*, 234 Cal.App.3d at p. 1229; see also *People v. Howard* (2005) 34 Cal.4th 1129, 1136.)

**Tyler's contentions about his jury trial**

Also in his letter brief, Tyler asked this court to address the following alleged errors from his jury trial:  the trial court failed to comply with its sua sponte duty to instruct on the presumption of innocence and reasonable doubt; the jury instructions that were given are not contained in the record; and the two cases should have been bifurcated.  Tyler argued his trial attorney was prejudicially ineffective for failing to challenge the prosecution's evidence about intent to kill for second degree murder; counsel failed to request any lesser included instructions; and counsel failed to challenge the prosecution's alleged inappropriate statements at the sentencing hearing.

In Tyler's first appeal, this court addressed and rejected the argument that the trial court erroneously denied the motion to bifurcate and sever the trials for codefendants Tyler and Watson.

As for his other trial contentions, while the filing of a *Wende* brief obligates this court to conduct a review of the entire record to determine whether there are any arguable issues that should be raised on an appellant's behalf (*Wende, supra*, 25 Cal.3d at p. 442), Tyler has raised issues from his trial that are not properly before this court in this appeal. "[W]here a criminal defendant could have raised an issue in a prior appeal, the appellate court need not entertain the issue in a subsequent appeal absent a showing of justification for the delay." (*People v. Senior* (1995) 33 Cal.App.4th 531, 538 (*Senior*).)  "[A]ll of the factual predicates upon which defendant's present contention[s] rest[] were available at the time of defendant's initial appeal.  There is no apparent justification as to why th[ese] issue[s] could not have been raised the first time defendant's case was before this court. There being no reason why defendant 'should get "two bites at the appellate apple," ' [citation], we deem defendant's claim of error to be waived." (*Ibid.*; see also *People v. Murphy* (2001) 88 Cal.App.4th 392, 396–397; *United States v. Wright* (9th Cir. 1983) 716 F.2d 549, 550 ["When a party could have raised an issue in a prior appeal but did not, a court later hearing the same case need not consider the matter"].

**Tyler's contentions arising from the denial of his petition for recall**

Tyler's letter brief raised several issues about the trial court's denial of his petition for recall. He asserts the factual statement contained in the prosecution's opposition was inaccurate, consisted of inadmissible hearsay, and the record does not prove he was convicted as the actual killer. As noted above, Tyler challenged the accuracy of the facts contained in the People's opposition to his petition for recall. As a result, we have cited the entirety of the factual statement from this court's opinion that affirmed his convictions and the judgment. In considering a petition for recall under section 1170.95, the court may review the facts as summarized in an appellate opinion affirming the petitioner's convictions. (*People v. Williams*, *supra*, 57 Cal.App.5th at pp. 660–663.)

Next, Tyler argues the trial court violated his due process rights because it did not hold a full hearing when it denied his petition for recall, and his attorney was ineffective for failing to argue that he was not the actual killer. When the trial court first considers a section 1170.95 petition, it shall determine whether the petitioner has made a prima facie showing that he falls within the provisions of this section. (*Martinez, supra*, 31 Cal.App.5th at p. 723.) If the petitioner makes such a showing, the court shall issue an order to show cause and conduct an evidentiary hearing. (*Ibid*.) In this case, however, the court denied Tyler's petition at the first stage of prima facie review under section 1170.95, subdivision (c), and found Tyler was the actual killer and ineligible for relief as a matter of law. This finding is supported by the record, and he was not entitled to an evidentiary hearing. Tyler "was the sole killer and a jury found [him] guilty of second degree murder under section 187, subdivision (a). Therefore, section 1170.95 does not apply to [him]." (*People v. Gallo* (2020) 57 Cal.App.5th 594, 599.)

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

## DISPOSITION

Tyler's request for appointment of a new appellate counsel is denied.

The court's order denying Tyler's petition for recall is affirmed.